UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLINA HIPSCHMAN, an individual; ALEXANDER HIPSCHMAN, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SAN DIEGO, a public entity; NIDIA ROMERO, an individual; ELIZABETH SAMUELS, an individual; JOSE PADILLA, an individual; MARY SHEHEE, an individual; DOE HHSA WORKERS 2-10, known but unidentified individuals; and DOES 1 THROUGH 20, inclusive,<br><br>Defendants. | Case No.: 22-cv-00903-AJB-BLM<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS**<br><br>**(Doc. No. 32)** |

This is a civil rights action arising out of the County of San Diego's social workers' decision to remove then nine-month-old C.H. from his parents' care during a hospital visit. C.H.'s parents, Plaintiffs Carolina Hipschman ("Ms. Hipschman") and Alexander Hipschman ("Mr. Hipschman"), filed a 42 U.S.C. § 1983 action against Defendants County of San Diego ("County") and its social workers Nidia Romero ("Ms. Romero"), Jose

Padilla ("Mr. Padilla"), Elizabeth Samuels ("Ms. Samuels"), and Mary Shehee ("Ms. Shehee"). The operative complaint is the First Amended Complaint ("FAC"). (Doc. No. 24.) Therein, Plaintiffs bring § 1983 claims for unwarranted seizure, coerced/unwarranted medical exams and procedures, judicial deception, malicious prosecution, and municipal liability. (*Id.*)

Before the Court is Defendants' motion to dismiss the FAC. (Doc. No. 32.) Plaintiffs filed an opposition, to which Defendants replied. (Doc. Nos. 40, 41.) For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion.

I. BACKGROUND[1]

On the morning of June 26, 2020, Ms. Hipschman picked up C.H. from his crib and noticed a small swelling on the side of his head. She pointed out the bump to her husband, and they decided to take him to Sharp Chula Vista Medical Center for examination. C.H. was not found to be in any pain or distress, and no significant abnormalities were noted other than the minor swelling. Because the hospital did not have the necessary imaging equipment to do a pediatrics scan, medical staff told Plaintiffs to take C.H. to Rady Children's Hospital ("Rady"), which they did.

At Rady, a CT scan was ordered, and it showed a hairline fracture on the left side of C.H.'s skull with some external bruising and minimal internal injury. Dr. Plonsker, a neurosurgeon, discussed the CT scan results with Ms. Hipschman. Dr. Plonsker explained that the fracture was minimal, that there was a little bleeding, but it was outside the brain, and that the injury was not severe. Dr. Plonsker also informed Ms. Hispchman that the nature of C.H.'s injuries happen often to infants and young children. Dr. Plonsker reassured Ms. Hipschman that C.H. would be fine and had no concerns about his prognosis. In an abundance of caution, Dr. Plonsker suggested C.H. remain in the hospital overnight for observation, and Ms. Hipschman agreed. Plaintiffs stayed in the hospital room with C.H. the entire day.

---

[1] The following facts are taken from the FAC, which the Court assumes as true for purposes of this motion. *See Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).

Due to the type of injury C.H. sustained, and in accordance with standard hospital protocol, a report was submitted to the San Diego County Health and Human Services Agency ("HHSA"), and Defendant Ms. Romero was assigned to investigate the referral. Upon Ms. Romero's arrival to Rady, she was provided a copy of a written consultation conducted by Dr. Vega. Dr. Vega was not C.H.'s treating physician and had not spoken with Plaintiffs or anyone else to ascertain the likely cause of C.H.'s injury. Dr. Vega's report stated, "In the absence of a plausible explanation, this injury is highly concerning of non-accidental trauma." Ms. Romero then consulted with her supervisor, Defendant Mr. Padilla, about her investigation, and they made the decision to seize C.H. from Plaintiffs' custody based on Dr. Vega's report. Ms. Romero did not speak with Dr. Vega or any of C.H.'s treating physicians that day.

After consulting with Mr. Padilla, around 8:30 p.m., Ms. Romero went into C.H's hospital room along with two police officers to speak with each parent separately. Plaintiffs provided Ms. Romero the same information they had given to C.H.'s medical providers. Ms. Hipschman also explained to Ms. Romero that C.H.'s treating physicians stated that C.H.'s exam was reassuring, that the injury was not severe, and that he was expected to heal on his own without medical intervention. She further relayed that the treating physicians informed her that C.H.'s injury commonly seen after birth and is usually caused by forceful external pressure to the baby's head during vaginal delivery, but that it could also have been caused by other things, like a bump or a fall.

In response to Ms. Hipschman's explanations, Ms. Romero stated, "Your baby has a broken skull. Somebody had to have hit him really hard over the head, like with a bat or something." When Ms. Hipschman asked Ms. Romero why she thought C.H. was hit by a bat, Ms. Romero stated that a medical specialist told her that. When Ms. Hipschman asked Ms. Romero for the medical specialist's name, Ms. Romero replied, "I can't tell you who it was. You don't need to know who it is. Just know that you're being investigated for child abuse and if you were a good parent, you would know what is wrong with your son. Somebody did this to him and I'm going to find out who."

When Ms. Romero interviewed Mr. Hipschman, he gave a general timeline of events leading up to the hospital visit. He provided the same information he previously recounted to C.H.'s treating physicians, including that the day before they saw the bump on C.H.'s head, C.H. had rolled off his floor mat and stuck his head on the floor, accidentally bumped his head against his crib, and had hit his head on his grandmother's mouth. The treating physicians indicated these events could have caused the injury.

After Plaintiffs' respective interviews, Ms. Romero told Plaintiffs, "somebody did this to him, you need to figure it out. Somebody hit him. I am the one who gets to decide whether or not he goes home." Plaintiffs referred Ms. Romero to C.H.'s treating physicians, particularly, Dr. Plonsker. According to Plaintiffs, Ms. Romero did not speak with C.H.'s treating physicians or attending staff, nor did she review his medical records. Ms. Romero told Plaintiffs that she was placing C.H. on a hospital hold, that they were not allowed to take C.H. home, and that he was now in the County's custody. Ms. Romero thereafter exited the room, leaving C.H. alone with his parents.

Around 12:00 p.m. the following day on June 27, 2020, Ms. Romero returned to the hospital and joined a conference call with two detectives and Dr. Suresh, who was part of Rady's Chadwick Center Child Protection Team. Dr. Suresh told Ms. Romero that the injury was "not a result of shaking the baby" and "not necessarily an abusive type injury." Dr. Suresh also did not rule out Plaintiffs' explanations for C.H.'s injuries as possible causes. Ms. Romero and the two detectives subsequently spoke about the information they gathered. The detectives stated they had no crime scene, no weapon, and no suspect. They also noted to Ms. Romero that the doctors were not concerned about the hairline fracture.

Ms. Romero later consulted with Mr. Padilla and together agreed that C.H. would not be discharged to his parents and instead transferred to the County's Polinsky Children's Center ("Polinsky Center"). C.H. was then discharged to Ms. Romero and removed from Plaintiffs' care without a warrant and over their objections. At that time, Ms. Romero also forced Ms. Hipschman to sign a medical treatment authorization form, stating "you don't have a choice, you have to sign it. If you don't, then I will just let my supervisor know and

we will let the judge know you are not cooperative, and that won't be good for you guys at all." Ms. Hipschman thereafter signed the form under protest. Later that day, Mr. Padilla directed Ms. Samuels to place C.H. with a foster parent in Oceanside, California, more than an hour away from Plaintiffs' home in Chula Vista, California.

On June 29, 2020, C.H.'s case, which included Ms. Romero's investigation notes, was transferred to Defendant Ms. Samuels, who conducted her own investigation. Ms. Samuels contacted Dr. Vega to inquire about her consultation report, specifically whether the C.H.'s injury could have happened by accident. Dr. Vega explained that because she had not been provided any explanation for the injury when her consultation was requested, her default position was to express a concern about non-accidental trauma.

The next day, on June 30, 2020, Ms. Samuels drafted and filed, after consultation with her supervisor Defendant Ms. Shehee, a "Juvenile Dependency Petition" to initiate an action to remove C.H. from Plaintiffs' custody. The Petition exaggerated C.H.'s injuries, stating that the "injury is of such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of the parent," and that "there is substantial risk that the child will suffer serious physical harm." Plaintiffs allege that, at the time she created the Petition, Ms. Samuels knew that, according to C.H.'s treating doctors and the detectives, that C.H.'s injury was not a severe one and could have been accidental. Ms. Samuels also later filed a Detention Report, which Plaintiffs assert contains incomplete and misleading information, painting a false narrative of Plaintiffs as abusive and dangerous parents.

At the July 1, 2020 detention hearing, the juvenile court judge read and considered the report into evidence and relied upon it in deciding that C.H. should continue to be detained from Plaintiffs' care. The judge also ordered that Plaintiffs be present for medical appointments for C.H.

After the hearing, C.H. was taken to a medical check-up appointment. Dr. Golembesky examined C.H. and stated to Ms. Hipschman and Ms. Samuels, "this is not an abused baby." Ms. Samuels then replied, "Doc, I'll be the one to determine that."

The next day, on July 2, 2020, Plaintiffs discovered that Ms. Samuels scheduled C.H. for a full body x-ray and bone scan and assessment with Dr. Vega. Ms. Hipschman voiced her objections to the additional scans, and Ms. Samuels replied: "[Y]ou are under investigation. You no longer have any rights regarding C.H.'s medical decisions. If you keep interfering, I'm going to tell the judge you are uncooperative, then you'll never get C.H. back."

On July 8, 2020, C.H. was transferred from the foster parent to his paternal grandfather. The next day, the grandfather took C.H. to the medical check-up Ms. Samuels' scheduled. Ms. Hipschman also went to the medical center, but Ms. Samuels did not allow her to accompany C.H. and his grandfather to the exam room. After the exam, Dr. Vega spoke with Ms. Hipschman privately and told her she did not think that C.H.'s injury was caused by abuse or neglect, that she was recommending the case be dropped, and that she was sorry all of this happened to Plaintiffs. Subsequently, with advice and authorization from her supervisor and over Ms. Hipschman's objections, Ms. Samuels insisted C.H. undergo another bone scan. No abnormalities were found.

Later in the day, Ms. Samuels went to the grandfather's house and without Plaintiffs' knowledge, consent, or presence, conducted her own physical examination of C.H. and took photographs of his bare lower body, including his genitalia. When the grandfather asked Ms. Samuels why she C.H. needed to undergo another exam after he had just been at his medical appointments, Ms. Samuels responded, "it is just something I need to do. If you interfere, I'll remove him and put him back in foster care."

A month later, on August 4, 2020, the juvenile court dismissed the case and made no findings of abuse or neglect by either parents. Plaintiffs regained full custody of C.H. Plaintiffs subsequently filed a formal complaint with HHSA for the unwarranted seizure, medical exams, and treatment. HHSA found their complaint partially founded, and program managers apologized to Plaintiffs and offered to use their experience as "a training tool." The instant lawsuit followed.

## II. LEGAL STANDARD

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). Facial plausibility is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* To determine the sufficiency of the complaint, the court must assume the truth of all factual allegations therein and construe them in the light most favorable to the plaintiff. *Cahill v. Liberty Mut. Ins. Co.*, 80 F.3d 336, 337–38 (9th Cir. 1996).

## III. DISCUSSION[2]

In their motion to dismiss, Defendants argue that: (1) Ms. Romero and Mr. Padilla are entitled to qualified immunity for removing C.H. from Plaintiffs' care; (2) Plaintiffs fail to state a claim against Ms. Romero, Ms. Samuels, and Ms. Shehee for judicial deception; (3) Ms. Samuels in entitled to qualified immunity for Plaintiffs' claim that C.H. received medical examinations in the County's custody without parental notice or consent; (4) Plaintiffs fail to state a malicious prosecution claim against Ms. Romero, Ms. Samuels, and Ms. Shehee; (5) Plaintiffs fail to state a claim for punitive damages against the social

---

[2] The Court **DENIES** Defendants' request for judicial notice (Doc. No. 32-2), finding the request reflects "[t]he overuse and improper application of judicial notice." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Defendants seek to have considered several juvenile court records. The information in the documents, however, are disputed, and thus, cannot be judicially noticed. *See id.* at 999. The Court also **DENIES** Defendants' request to have the documents considered under the incorporation by reference doctrine, finding it an impermissible attempt "to insert their own version of events into the complaint to defeat otherwise cognizable claims" at this stage of the proceedings. *See id.* at 1002. Consideration of these materials would be more appropriate in connection with a motion for summary judgment. Finally, as Defendants' motion to seal concerns the juvenile court records the Court declines to consider it at this time, the Court **DENIES** the sealing motion as moot. (Doc. No. 30.)

worker defendants; and (6) Plaintiffs fail to state a claim for municipal liability against the County. The Court considers Defendants' arguments in turn.

### A. Qualified Immunity

Qualified immunity shields a government official from liability for civil damages if (1) the law governing the official's conduct was clearly established; and (2) under that law, the official objectively could have believed that her conduct was lawful." *Mabe v. San Bernardino Cnty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1106 (9th Cir. 2001). Where, as here, the defendants assert qualified immunity in a motion to dismiss under Rule 12(b)(6), dismissal is not appropriate unless the court can determine, based on the complaint itself, that qualified immunity applies. *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016) (quoting *Groten v. California*, 251 F.3d 844, 851 (9th Cir. 2001)). In considering qualified immunity, the court must accept the allegations in the plaintiff's complaint as true and construe them in the light most favorable to the plaintiff. *Hyde v. City of Willcox*, 23 F.4th 863, 869 (9th Cir. 2022). "If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then plaintiffs are entitled to go forward with their claims." *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) (internal quotations and citation omitted).

As to the first prong of the qualified immunity test, "[a] right is clearly established if the contours of the right are sufficiently clear that a reasonable official would understand that what [s]he is doing violates that right." *Rogers v. Cnty. of San Joaquin*, 487 F.3d 1288, 1297 (9th Cir. 2007) (internal alterations, quotations, and citation omitted). "The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority." *Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019). As to the second prong, the test focuses on "whether a reasonable official could have believed her conduct was lawful." *Mabe*, 237 F.3d at 1107.

**1) Removal from Plaintiffs' Care**

    **a. Clearly Established Law**

Defendants argue that Ms. Romero and Mr. Padilla are entitled to qualified immunity on Plaintiffs' cause of action for unwarranted seizure because Plaintiffs have not identified clearly established law governing the social workers' removal of C.H. from Plaintiffs' care. The Court disagrees.

"In 1993, it was clear that a parent had a constitutionally protected right to the care and custody of his children and that he could not be summarily deprived of that custody without notice and a hearing, except when the children were in imminent danger." *Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997). The Ninth Circuit reaffirmed this holding in *Wallis* and specified that "the state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse." *Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000). The *Wallis* court further instructed that an official "cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed." *Id.* Since *Wallis,* the Ninth Circuit has continued to apply this exigency requirement to a warrantless removal of a child from his parent. *See Mabe,* 237 F.3d at 1107; *Rogers,* 487 F.3d at 1294; *Keates*, 883 F.3d at 1238.

The Court is unpersuaded by Defendants' argument that to defeat their qualified immunity defense, Plaintiffs must point to a case with factual allegations similar to those raised here. There need not be "a prior case with identical, or even materially similar facts" to find a law was clearly established. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1065 (9th Cir. 2006) (internal quotations omitted); *Rogers*, 487 F.3d at 1297 (same). It is enough that "the preexisting law provided the defendants with fair warning that their conduct was unlawful." *Kennedy*, 439 F.3d at 1065 (internal quotations omitted). Ninth Circuit case law sufficiently defines the contours of the right at issue here such that a reasonable official had fair warning and would understand that what she is doing violates that right. *See id.* It

is "beyond debate" that existing precedent establishes that children can only be taken from their parents' custody without a warrant to protect them from imminent physical injury before a warrant could be obtained. *Demaree v. Pederson*, 887 F.3d 870, 883 (9th Cir. 2018). The Ninth Circuit has "repeatedly held that a family's rights were violated if the children were removed absent an imminent risk of serious bodily harm." *Rogers*, 487 F.3d at 1297. Accordingly, the Court finds there was clearly established law governing Ms. Romero's and Mr. Padilla's conduct in this case.

### b. Objective Belief that Conduct was Lawful

Having found that clearly established law governs the social workers' decision to remove C.H. from Plaintiffs' custody, the Court considers whether under the exigency requirement, "the official objectively could have believed that her conduct was lawful." *Mabe*, 237 F.3d at 1106; *accord Rogers*, 487 F.3d at 1297.

Here, accepting the factual allegations in the FAC as true and drawing all inference in the light most favorable to Plaintiffs, the Court finds no reasonable social worker would have believed that C.H. was in imminent danger. Defendants argue that it was reasonable for Ms. Romero to believe C.H. was in imminent danger due to the nature of the injury he sustained and Dr. Vega's written consultation report. While "serious allegations of abuse which are investigated and corroborated usually gives rise to a reasonable inference of imminent danger," there was no such corroboration or reasonable investigation here. *See Ram*, 118 F.3d at 1311; *see Wallis*, 202 F.3d at 1138 (An official "cannot seize children suspected of being abused or neglected unless reasonable avenues of investigation are first pursued.").

According to the FAC, Plaintiffs informed Ms. Romero of the potential incidents that could have caused C.H.'s injury, as well as the neurosurgeon's determination that the fracture was not severe, happened often to infants, and would heal without need for medical intervention. Aside from the bump, C.H. was healthy, alert, and showed no signs of pain or distress. Ms. Romero was thus in possession of information undermining an emergency. Indeed, even after deciding to place C.H. on a hospital hold and in the County's custody,

Ms. Romero left C.H. alone in his hospital room with his parents for the rest of the night and the following morning—undermining a reasonable belief that C.H. was in imminent danger of abuse from his parents. *See, e.g.*, *Rogers*, 487 F.3d at 1295 ("an official's prior willingness to leave the children in their home militates against a finding of exigency").

The FAC also indicates that Ms. Romero made no attempt to speak with Dr. Vega about her report or with any of C.H.'s treating physicians to clarify the circumstances. Moreover, when she returned to Rady the following day, Dr. Suresh, another consulting doctor told her that the fracture was not necessarily an abusive type of injury and did not rule out Plaintiffs' explanations for the accident as possible causes. The detectives on the case also informed Ms. Romero they had no crime scene, no weapon, and no suspect, and reiterated that the doctors were not concerned about the fracture. That there was no reasonable basis to believe a crime has been, or will be, committed further undercuts any perceived risk of serious bodily harm upon C.H.

Faced with this information, every reasonable social worker would understand she had no specific, articulable evidence that C.H. is in imminent danger of abuse, and consequently, would need to obtain a warrant to remove the child from his parents. The FAC alleges it takes less than four hours to obtain a warrant. Ms. Romero could have obtained a warrant between the time she finished interrogating Plaintiffs and her return to the hospital the next afternoon. The chances of immediate injury to C.H. in the time it would take secure a warrant were very low. "So remote a risk does not establish reasonable cause to believe that the children were in immediate danger." *Rogers*, 487 F.3d at 1295.

At bottom, the FAC establishes there was no imminent danger to C.H. Yet, Ms. Romero, with approval from her supervisor Mr. Padilla, decided to remove C.H. from his parents' custody without a warrant. Assuming the truth of the factual allegations in the FAC and drawing all reasonable inference therefrom in Plaintiffs' favor, the Court finds no reasonable social worker could have objectively believed that C.H. was in imminent danger of abuse from his parents. Because a reasonable social worker would have understood that C.H. faced no imminent risk of serious bodily harm, as required by clearly

established law, Ms. Romero and Mr. Padilla are not entitled to qualified immunity. Accordingly, the Court **DENIES** Defendants' motion to dismiss on this basis.

### 2) Medical Examinations

#### a. Clearly Established Law

Defendants similarly argue that Ms. Samuels is entitled to qualified immunity on Plaintiffs' cause of action for coerced/unwarranted medical examination and procedures because Plaintiffs have not identified case law to put Ms. Samuels on notice that her conduct was unlawful. The Court again disagrees.

*Wallis* holds "parents have a right arising from the liberty interest in family association to be with their children while they are receiving medical attention (or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted)." 202 F.3d at 1142. The Ninth Circuit explained nine years later that "[t]he language of *Wallis* is clear and unambiguous: government officials cannot exclude parents entirely from the location of their child's physical examination absent parental consent, some legitimate basis for exclusion, or an emergency requiring immediate medical attention." *Greene v. Camreta*, 588 F.3d 1011, 1037 (9th Cir. 2009), *vacated on other grounds in* 661 F.3d 1201 (9th Cir. 2011). The Ninth Circuit reiterated this holding about a decade later in *Mann*, which makes clear "that the County is required to: (1) notify the parents of a medical examination of their children; (2) obtain parental consent or a court order in advance of the medical examination; and (3) permit the parent to be present at the examination." *Benavidez v. Cnty. of San Diego*, 993 F.3d 1134, 1150 (9th Cir. 2021) (citing *Mann v. Cnty. of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018)).

Again, "closely analogous prior case law involving an identical fact context is not required for qualified immunity to be withheld." *Id.* at 1152. Preexisting precedent sufficiently defined the rights at issue here such that a reasonable social worker would understand that what she is doing violates the right. Accordingly, the Court finds there was clearly established law governing Ms. Samuels' conduct in this case.

### b. Objective Belief that Conduct was Lawful

Having found that clearly established law governs Ms. Samuels' decision to subject C.H. to medical exams and procedures, the Court considers whether "the official objectively could have believed that her conduct was lawful." *Mabe*, 237 F.3d at 1106; *accord Rogers*, 487 F.3d at 1297.

Assuming as true the factual allegations in the FAC and drawing all reasonable inferences therefrom in Plaintiffs' favor, the Court finds no reasonable social worker could have objectively believed that her conduct was lawful under preexisting precedent. At issue are the medical evaluation, bone scan, and physical examination conducted on July 9, 2020. Clearly established law required Ms. Samuels to: (1) notify the parents of a medical examination of their children, (2) obtain parental consent or a court order in advance of the medical examination, and (3) permit the parent to be present at the examination or to be in a waiting room or other nearby area if there is a valid reason for excluding them while all or a part of the medical procedure is being conducted. *See Wallis*, 202 F.3d at 1142; *Mann*, 907 F.3d at 1162.

The FAC demonstrates she did none of these things. Plaintiffs were not notified of any of these exams and were not permitted to be in the exam room with C.H.—despite there being no valid reason or emergency requiring immediate medical attention and despite clear instructions from the juvenile court that Plaintiffs were to be present at medical appointments for the minor. *Cf. Mann*, 907 F.3d at 1163 ("In an emergency medical situation, the County may proceed with medically necessary procedures without parental notice or consent to protect the child's health."). The FAC also contains allegations indicating the exams were not medically necessary, but rather, purely investigatory. Parental notice and consent are "even more warranted" when the examinations are not purely for health reasons. *Mann*, 907 F.3d at 116.

Defendants argue that Plaintiffs gave consent because they signed a "Consent for Examination and Treatment" form for C.H. when he was removed from his parents' care. The FAC, however, contains allegations that Ms. Romero coerced Ms. Hipschman into

signing the form. Specifically, the FAC details that Ms. Romero told Plaintiffs, in a threatening manner, that they had no choice but to sign the form, and that if they did not, she would tell the judge they were being uncooperative, which would make the situation worse for them. "[T]he Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (1973).

Because a reasonable social worker would have understood that her failure to notify Plaintiffs of C.H.'s exams, failure to obtain valid consent or judicial authorization for the exams, and failure to permit Plaintiffs in the exam room when no valid reason or exigency existed, was in violation of clearly established law, Ms. Samuels is not entitled to qualified immunity. Accordingly, the Court **DENIES** Defendants' motion to dismiss on this basis.

**B. Judicial Deception**

Next, Defendants argue that Plaintiffs fail to state a claim for judicial deception against Ms. Romero, Ms. Samuels, and Ms. Sheheee. Specifically, Defendants argue that Plaintiffs make only conclusory claims of misrepresentations made to the juvenile court and their judicial deception claim is barred by the *Rooker-Feldman* doctrine. The Court disagrees.

To state a claim for judicial deception, a plaintiff must allege: "(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision." *Benavidez*, 993 F.3d at 1147. First, the Court finds the FAC contains particularized allegations of misrepresentations and omission in the information submitted to the juvenile court. As Plaintiffs point out in their opposition brief, they have alleged several detailed examples of false information included in the Detention Report on which the juvenile court relied in making her decision.

Plaintiffs allege that Ms. Romero created a false and misleading record of her investigation, which "set in motion a series of events that would, predictably, be used by others to construct a false narrative which, on its face, was unreasonably and unjustifiably prejudicial to [Plaintiffs]." (Doc. No. 24 at 30.) Specifically, Ms. Romero falsely reported

the substance of her interviews with Plaintiffs and other witnesses in a way that undermined Plaintiffs' credibility and knowledge of the injury's cause. (*Id.* at 28–30.)

Plaintiffs also allege that the Detention Report Ms. Samuels and Ms. Shehee submitted to the juvenile court included false statements, including that C.H.'s injury was severe even though they knew, according to C.H.'s treating physicians that it was not concerning and would heal on its own. (*Id.* at 31.) Dr. Vega also made it clear to Ms. Samuels that she did not have complete information at the time she wrote her consultation report and had not interviewed Plaintiffs to learn their perspective on what may have caused the injury. (*Id.* at 30–31.) And when Ms. Samuels asked Dr. Vega whether Plaintiffs' explanations were plausible, she informed her that they were. (*Id.* at 31.) Yet, Ms. Samuels omitted this information from the Detention Report. (*Id.* at 31–32.) Plaintiffs further assert that Ms. Shehee worked with Ms. Samuels to draft the Detention Report, and in doing so, refrained from including known exculpatory information, and instead made up a false narrative based solely on the initial hospital referral and Ms. Romero's false and incomplete disclosures in her case notes. (*Id.* at 34.)

Second, taking the FAC as true and construing its allegations in the light most favorable to Plaintiffs, these allegations support a plausible inference that the social workers submitted the information deliberately or with at least reckless disregard for the truth. Plaintiffs allege that despite knowing there was other evidence that the injury was not severe and could have been accidental and consistent with Plaintiffs' explanations, the social workers omitted the information from their reports. Third, Plaintiffs have adequately pled that the misrepresentations and omissions were material to the juvenile court's decision. Plaintiffs allege, and it is reasonable to infer from the facts, that the juvenile court relied upon the misrepresented nature of the injury and lack of plausible explanation in her decision to continue C.H.'s detention from his parents.

Considering the specificity with which Plaintiffs allege the various false and misleading statements and omissions made by the social workers, the Court finds they satisfy Rule 9(b)'s heightened standard for fraud. Based on the foregoing, the Court finds

Plaintiffs have sufficiently pled a judicial deception claim against Ms. Romero, Ms. Samuels, and Ms. Shehee.

Moreover, Defendants' argument that the *Rooker-Feldman* doctrine bars Plaintiffs' judicial deception claim is without merit. "If a plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, *Rooker-Feldman* bars subject matter jurisdiction in federal district court. If a plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction." *Benavidez*, 993 F.3d at 1142 (internal alterations and citation omitted). Plaintiffs make clear they are not alleging legal error by a state court, but rather, an illegal act or omission by an adverse party. More specifically, they allege misrepresentations and omission by social workers that resulted in violations of their constitutional rights. They are not seeking an appeal of the juvenile court order. The *Rooker-Feldman* doctrine therefore does not preclude Plaintiffs' judicial deception claim. *See id.*; *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1141 (9th Cir. 2004) (*Rooker-Feldman* "does not bar subject matter jurisdiction when a federal plaintiff alleges a cause of action for extrinsic fraud on a state court.").

For the foregoing reasons, the Court finds Plaintiffs have adequately pled a judicial deception claim and the *Rooker-Feldman* bar does not apply. Accordingly, the Court **DENIES** Defendants' motion to dismiss on this basis.

**C. Malicious Prosecution**

In response to Defendants' motion to dismiss their malicious prosecution claim, Plaintiffs acknowledge this is a civil proceeding and that controlling precedent holds that malicious prosecution "is a concept applicable only in criminal proceedings." *Paskaly v. Seale*, 506 F.2d 1209, 1212 (9th Cir. 1974). As Plaintiffs have abandoned this claim, the Court **GRANTS** Defendants' motion to dismiss on this basis.[3]

---

[3] To the extent Plaintiffs wish to amend their FAC to add a retaliation claim as suggested in their opposition brief, they must file a motion to amend the FAC in accordance with the local and federal rules.

### D. Punitive Damages

Defendants argue that Plaintiffs' request for punitive damages should be dismissed because they have not pled facts sufficient for punitive damages. The Court disagrees. Punitive damages may be awarded in a § 1983 action "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Dang v. Cross*, 422 F.3d 800, 807 (9th Cir. 2005) (citation omitted). The FAC contains factual allegations from which it could be reasonably inferred that the social workers acted with at least "reckless or callous indifference" to Plaintiffs' federally protected rights. *Id.* For example, the FAC specifies that the social workers made several threatening, accusatory, and condescending remarks towards Plaintiffs and omitted important facts from their reports to undermine Plaintiffs' credibility. These allegations give rise to inferences sufficient to support a claim for punitive damages. Accordingly, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' request for punitive damages.

### E. Municipal Liability

Finally, Defendants move to dismiss Plaintiffs' claim for municipal liability against the County. To state a § 1983 claim against a municipality, a plaintiff must allege "(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" *Oviatt ex rel. Waugh v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389–91 (1989)).

Defendants contend that Plaintiffs fail to identify any formal policy or longstanding custom to support municipal liability against the County. The Court disagrees. Plaintiffs allege that the County had several customs or practices that caused the violation of their rights, including: (1) "removing children from their parents' custody without consent or a court order, in the absence of exigent circumstances (i.e., imminent danger of serious bodily injury)" and "without first performing a reasonable investigation"; (2) "subjecting

children to unwarranted, non-consensual forensic medical examinations and/or investigatory medical assessments" and excluding parents from these exams; and (3) "including false, inaccurate, exaggerated, misleading, and/or untrue factual statements in the documents and/or reports filed with the juvenile court" and "suppressing and/or omitting known exculpatory evidence from documents and/or reports filed with the juvenile court." (Doc. No. 24 at 65–66, 72–75, 81–82.)

In support of their identified customs and practices, Plaintiffs' FAC points not only to the underlying factual allegations of their case, but to those in other cases against the County alleging similar facts and violations over the years. (*Id.* at 66, 67–69, 75–77, 82–84.) Plaintiffs additionally allege that the County did not investigate or discipline the allegedly offending social workers in this case or in the other cases cited in the FAC. (*Id.* at 69–70, 77–78, 84–85.) That the cited cases ultimately settled does not change the reasonable inferences drawn therefrom. The Court finds the FAC contains sufficient factual matter to give rise to a reasonable inference of a longstanding custom that causes constitutional violations, and thus, plausibly state a claim for relief against the County. *See D.C. by & through Cabelka v. Cnty. of San Diego*, 445 F. Supp. 3d 869, 892 (S.D. Cal. 2020) ("A policy or custom may be inferred from 'evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded.'") (quoting *Nadell v. Las Vegas Metro. Police Dep't*, 268 F.3d 924, 929 (9th Cir. 2001)). "It is a rare plaintiff who will have access to the precise contours of a policy or custom prior to having engaged in discovery, and requiring a plaintiff to plead its existence in detail is likely to be no more than an exercise in educated guesswork." *Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1174 (E.D. Cal. 2019).

The Court further finds that Plaintiffs have pled enough to state a failure to train claim against the County. A municipality may be liable under § 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. County of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006). A plaintiff asserting a *Monell* claim based on a failure to train must identify how the

municipality's training was inadequate and that the inadequate training represents municipal policy. *See id.*

Here, Plaintiff alleges that the "County does not adequately train its 'weekend' social workers to be truthful, honest, accurate, and to not engage in deception in the presentation of evidence, and a parent and child's Constitutional Rights" and "does not provide training on all policy updates, and does not expect its social workers to know every policy or procedure." (Doc. No. 24 at 89.) The FAC states that Mr. Padilla—Ms. Romero's supervisor and a program manager for HHSA—admitted "that there had been no basis to remove C.H. from their care without a warrant or court order that day, and that 'weekend staff had not been adequately trained on the protocols.'" (*Id.* at 13 n.4.) Plaintiffs also allege that another program manager for the County, who is also Ms. Samuels' and Ms. Shehee's supervisor, also admitted that "HHSA training for its weekend staff is 'not adequate and needs to be better.'" (*Id.* at 54.) The supervisors' concessions indicate that the County has not sufficiently trained a whole group of social workers—not just the social workers at issue in this case. The FAC also indicates that despite the supervisors' awareness of the inadequate training and the Defendant social workers' errors, none of them were disciplined. (*Id.*)

Thus, the Court finds Plaintiffs' allegations raise a reasonable inference that the County was deliberately indifferent to the rights of the persons with whom the untrained employees are likely to come into contact with, and that the injury would have been avoided if the county properly trained its employees. *See Long*, 442 F.3d at 1186 (A municipality may be liable under § 1983 "where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact."); *Rodriguez v. Cty. of L.A.*, 891 F.3d 776, 803 (9th Cir. 2018) (A plaintiff may prove deliberate indifference through "evidence of a 'failure to investigate and discipline employees in the face of widespread constitutional violations.'").

Based on the foregoing, the Court **DENIES** Defendants' motion to dismiss Plaintiffs' municipal liability claim.

## IV. CONCLUSION

Accordingly, for the reasons stated herein, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion to dismiss. (Doc. No. 32.) Plaintiffs' malicious prosecution claim is **DISMISSED WITHOUT LEAVE TO AMEND**. All other claims in the FAC remain. Defendants' must file their Answer to the FAC no later than Friday, September 15, 2023.

**IT IS SO ORDERED**.

Dated: September 5, 2023

Hon. Anthony J. Battaglia
United States District Judge