# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLINA HIPSCHMAN, et al., | Case No.: 22-cv-00903-AJB-BLM |
| Plaintiffs, | **OMNIBUS ORDER** |
| v. | |
| COUNTY OF SAN DIEGO, et al., | **(Doc. Nos. 159, 160, 163, 164, 167)** |
| Defendants. | |

//

//

//

//

//

//

//

//

//

//

1

# Table of Contents

I.  BACKGROUND...................................................................................................5

    A.  Factual Background....................................................................................5

        1.  The discovery of C.H.'s injury. .....................................................5

        2.  The Hipschmans' account of the June 26, 2020 medical examination of C.H. ......................................................................................................5

        3.  Medical staffs' account of the June 26, 2020 medical examination of C.H.6

        4.  The police investigation. ...............................................................8

        5.  The Hipschmans' account of Romero's investigation.................10

        6.  Defendants' account of Romero's investigation. ........................11

        7.  The decision to remove C.H. ........................................................15

        8.  Samuels' investigation. ................................................................16

        9.  The initial dependency proceedings. ...........................................20

        10. The Hipschmans' account of C.H.'s medical examinations while in Defendants' custody. ...................................................................23

        11. Defendants' account of C.H.'s medical examinations while in Defendants' custody. ...................................................................24

        12. Medical staffs' account of C.H.'s medical examinations while in Defendants' custody. ...................................................................24

        13. The termination of dependency proceedings................................25

    B.  Procedural Background ............................................................................26

II. LEGAL STANDARD .........................................................................................26

    A.  *Daubert* Motions ....................................................................................26

    B.  Motions for Summary Judgment .............................................................28

III. DISCUSSION ....................................................................................................28

    A.  Evidentiary Motions and Requests..........................................................28

        1.  Motions to Exclude.......................................................................28

            a.  Melinda Murphy, M.A..........................................................28

            b.  Stephen Papaleo, Ph.D..........................................................32

        2.  Request for Judicial Notice...........................................................36

        3.  Evidentiary Objections .................................................................37

B.   Motions for Summary Judgment ...................................................................38

1.   Claim 1 – Unlawful removal ........................................................38

a.   Defendants may have had reasonable cause to believe that C.H. faced an immediate threat of serious physical injury. ...............................40

i.   Serious physical injury from abuse ............................................40

ii.   Serious physical injury from neglect ........................................43

b.   Defendants may have pursued all reasonable avenues of investigation. ..................................................................................45

c.   It is not clear whether the removal of C.H. exceeded the scope of action needed to protect C.H. ..........................................................47

d.   The Ninth Circuit has not explained when the warrantless removal of an infant to prevent neglect violates the Constitution. .......................47

2.   Claim 2 – Deprivation of notice, consent, presence ...................50

a.   Samuels' examination of scratches near C.H.'s groin ........................50

b.   Skeletal survey ...............................................................................51

i.   Right to Notice ............................................................................51

ii.   Right to Consent ........................................................................53

c.   General examination ......................................................................54

i.   Right to Notice ............................................................................54

ii.   Right to Consent ........................................................................54

iii.   Right to be Present ....................................................................57

3.   Claim 3 – Judicial deception......................................................59

4.   Claim 4 – Monell liability...........................................................65

a.   Count 1 – Unlawful removal..........................................................66

b.   Count 2 – Deprivation of notice, consent, presence ........................67

i.   Alleged Polinsky intake examination ........................................68

ii.   Samuels' examination of scratches near C.H.'s groin ................69

iii.   Skeletal survey ...........................................................................69

iv.   General examination ...................................................................70

c.   Count 3 – Judicial deception..........................................................71

IV.   CONCLUSION.......................................................................................71

22-cv-00903-AJB-BLM

In June 2020, Defendant County of San Diego (the "County") removed then 7-month-old C.H. from his parents', Plaintiffs Carolina and Alexander Hipschmans',[1] custody. The County retained custody of C.H. from June 27, 2020, to August 4, 2020.

The Hipschmans subsequently initiated this civil rights action against the County and Individual Defendants Nidia Romero ("Romero"), Elizabeth Samuels ("Samuels"), Jose Padilla ("Padilla"), Mary Shehee ("Shehee"), Tin Le ("Le"), and Maria Araiza ("Araiza") (collectively, "Individual Defendants"),[2] who were employed by the County at the time of the removal. The Hipschmans have alleged, *inter alia*, that the Individual Defendants (1) unlawfully removed C.H.; (2) deprived the Hipschmans of their rights to notice of, to consent to, and to be present for medical examinations of C.H.; and (3) unlawfully engaged in judicial deception. The Hipschmans additionally allege that the County is liable for the constitutional torts the Individual Defendants allegedly committed.

With discovery completed, Defendants now move to exclude portions of the testimony and opinions offered by the Hipschmans' retained experts, Melinda Murphy ("Murphy") and Dr. Stephen Papaleo ("Dr. Papaleo"). (Doc. Nos. 159; 160.) The parties have also cross-moved for summary judgment and/or partial summary judgment. (Doc. Nos. 163; 164; 167.) The motions are fully briefed. (Doc. Nos. 159–60; 163–64; 167; 172–75; 186.)

For the reasons set forth below, the Court **GRANTS** Defendants' motion to exclude portions of Murphy's opinions and testimony (Doc. No. 159); **GRANTS IN PART and DENIES IN PART** Defendants' motion to exclude portions of Dr. Papaleo's opinions and

---

[1] This Order uses the Plaintiffs' first names to refer to each Plaintiff individually to avoid confusion between Plaintiffs Carolina and Alexander Hipschman and Mr. Thomas Hipschman ("Thomas"), who is Alexander's father and Carolina's father-in-law. (*See* Doc. No. 190 at 437, 531.) The Order refers to Carolina and Alexander collectively as "the Hipschmans."

Additionally, page citations refer to the pagination generated by the Case Management/Electronic Case Files system.

[2] The Order uses the term "Defendants" to refer collectively to the County and Individual Defendants.

22-cv-00903-AJB-BLM

testimony (Doc. No. 160); and **GRANTS IN PART and DENIES IN PART** the cross-motions for summary judgment (Doc. Nos. 163, 164, 167).

# I.    BACKGROUND

## A.    Factual Background

### 1.    The discovery of C.H.'s injury.

On June 26, 2020, the Hipschmans resided with Carolina's parents, Frank Floyd ("Frank") and Emma Floyd ("Emma"); Carolina's brother, Frank Floyd III; and Alexander's first son, M.H. (Doc. No. 163-2 at 9–10.)

Around 6:00 a.m. that day, Carolina discovered swelling on the left side of C.H.'s head. (*Id.* at 12.) The Hipschmans immediately took C.H. to the emergency room. (*Id.* at 13–16.) The emergency room doctor referred the Hipschmans and C.H. to Rady Children's Hospital ("Rady") because the emergency room lacked the ability to take a CT scan or x-ray of an infant. (*Id.* at 18–19.) The Hipschmans then took C.H. to Rady. (*Id.* at 19.)

### 2.    The Hipschmans' account of the June 26, 2020 medical examination of C.H.

At Rady, C.H. was examined by a doctor. According to Carolina, the doctor asked her if C.H. had been injured, to which Carolina responded, "No. I don't remember an injury." (Doc. No. 190 at 397.) The doctor proceeded to order a CT scan and bloodwork tests for C.H. (*Id.*) The CT scan revealed that C.H. had suffered a fracture on the left side of his skull with some bleeding. (*Id.* at 400, 410.)

After the CT scan, the doctor and a hospital social worker asked Carolina if she could remember anything that might have caused the fracture. (*Id.* at 400.) Carolina told the doctor that on Thursday, June 25, C.H. hit his head on Emma's mouth (the "Emma" incident). (*Id.* at 400–01.) Carolina also said that on either Tuesday, June 23, or Wednesday, June 24, she saw C.H. "hit his head really, really hard on the crib, the left side of his head on the crib" through a baby monitor (the "Crib" incident). (*Id.* at 401.) Carolina additionally informed the doctor that on June 24, C.H. fell from a sitting position and hit the left side of his head on a wooden floor (the "Carolina Mat" incident). (*Id.* at 405–07.)

5

The doctor did not take notes during this conversation, but the hospital social worker did. (*Id.* at 407–08.) A second doctor subsequently reviewed some notes with Carolina, who confirmed the Emma, Crib, and Carolina Mat incidents. (*Id.* at 409.)

Carolina then met with Dr. Jillian Plonsker ("Dr. Plonsker"). (*Id.* at 410.) According to Carolina, Dr. Plonsker stated that C.H. had a "slight hairline fracture" that had a little bleeding "like a bruise." (*Id.*) Carolina also states that she discussed the Emma, Crib, and Carolina Mat incidents with Dr. Plonsker. (*Id.* at 411.) Carolina did not identify any additional incidents for Dr. Plonsker. (*Id.*)

Alexander indicates that he was also in the meeting with Dr. Plonsker and that she asked the Hipschmans if they could think of any cause of C.H.'s injury. (*Id.* at 524.) According to Alexander, the Hipschmans told Dr. Plonsker about how they had already spoken with social workers about the Emma, Crib, and Carolina Mat incidents. (*Id.* at 525.) Alexander noted that Carolina discussed a fourth incident (the "M.H. Mat" incident) where C.H. fell onto the floor while Carolina was in the bathroom, after which M.H. "decided to move [C.H.] back on the mat" and "bonked [C.H.'s] -- hit [C.H.'s] head on the floor in the process of doing so." (*Id.* at 526.) Alexander claims that "Dr. Plonsker said those are all potential things. If you can't narrow it down, those are all things that would make sense that could have done this to him." (*Id.*)

### 3.    Medical staffs' account of the June 26, 2020 medical examination of C.H.

No party has provided records from the first two doctors who examined C.H. or the hospital social worker to support these motions.

It appears that at least one of the doctors asked Dr. Nicole Ayson ("Dr. Ayson"), Dr. Shalon Nienow ("Dr. Nienow"), and Dr. Sarah Vega ("Dr. Vega") to provide a telephone consultation on next steps for C.H.'s evaluation because "there was no history of trauma provided to explain" C.H.'s injury. (Doc. No. 163-2 at 80; *see also* Doc. Nos. 163-2 at 84, 90; 190 at 209, 251–52, 255.) In performing the consultation, Dr. Ayson, Dr. Nienow, and Dr. Vega relied on information collected by other Rady staff from the Hipschmans. (Doc.

22-cv-00903-AJB-BLM

No. 190 at 204–06, 208, 256.) However, the doctors did not have sufficient information to determine whether C.H. was abused physically. (*Id.* at 244, 252–53.) Dr. Vega found the injury highly concerning because of a lack of any history of accidental trauma. (Doc. No. 163-2 at 84.) The doctors thus recommended that the matter be referred to the County's Health and Human Services Agency and law enforcement. (Doc. No. 190 at 257; *see also* Doc. No. 189 at 187.)

> In the written consultation note, Dr. Vega recorded that C.H.'s
>
> head injuries would have been caused by direct impact to the left side of his skull. In a young infant who requires constant supervision, the event leading to this severe injury would have been readily apparent to any prudent caregiver. **In the absence of a plausible explanation, this injury is highly concerning for non-accidental trauma**. If [C.H.] were to be returned to the environment in which his injuries [were sustained], it would place him at high risk of further maltreatment.

(Doc. No. 189 at 187[3]; *see also* Doc. No. 163-2 at 84–85 (explaining typographical error).)

Dr. Plonsker indicates that she "was consulted to comment on medical management of [C.H.'s] injury." (Doc. No. 190 at 129.) Prior to speaking with the Hipschmans and examining C.H., Dr. Plonsker reviewed C.H.'s medical records, which indicated "that there was no known trauma history." (*Id.* at 132–33.) During the examination, Dr. Plonsker reassured the Hipschmans that C.H.'s injury would heal without treatment. (*Id.* at 130.) Because no treatment was needed, Dr. Plonsker considered C.H.'s injury to be "minor." (*Id.* at 157–58.) However, Dr. Plonsker has acknowledged that others "could also argue that any bleeding in the brain or on the brain is a serious injury." (*Id.* at 157.) Despite her consideration of the injury as minor, Dr. Plonsker agreed that C.H. should have a

---

[3] The Court notes that this appears to be an incomplete copy of the consultation note. The last line of the document is cut off, but it appears to say "Page 1 of" and it is not clear if the last number is a "2" or a "3." (*Id.*) The Court additionally recognizes that this was not a final version of the notes because a cosign was still needed. (*Id.*; *see also* Doc. No. 190 at 259–60.)

22-cv-00903-AJB-BLM

nonaccidental trauma work-up because of "the lack of a known mechanism of trauma at the time that [she] wrote [her] note." (*Id.* at 166.)

On June 27, Dr. Premi Suresh ("Dr. Suresh") spoke with Detective Robert Murgia ("Detective Murgia"), Detective Manuel Salazar ("Detective Salazar"), and Romero. (Doc. No. 190-1 ¶ 4.) The doctors who examined C.H. were not available at that time, so Dr. Suresh was brought in to help the detectives and Romero understand C.H.'s injury. (*See* Doc. No. 190 at 179–80; *see also* Doc. Nos. 190-1 ¶ 7; 191 at 117.) Dr. Suresh could not determine if C.H.'s injury was caused by abuse or an accident. (Doc. No. 190 at 175.) Dr. Suresh "did not see, in the records available to [her] at the time, any explanation of how [C.H.'s] injury might have happened." (Doc. No. 190-1 ¶ 10.) However, Dr. Suresh did tell the detectives and Romero that the Emma incident would not cause C.H.'s injury. (*Id.* ¶ 6.)

### 4.   The police investigation.

On June 26 at approximately 5:45 p.m., Officer Daniel Anderson ("Officer Anderson") and Agent Christopher Fisher ("Agent Fisher") were dispatched to Rady to evaluate a potential child abuse case. (Doc. Nos. 163-2 at 103–04; 189 at 56.) A Rady nurse notified Officer Anderson and Agent Fisher that the Hipschmans brought C.H. to Rady at approximately 7:00 a.m. (Doc. No. 189 at 56.) The nurse also shared that "[t]he parents did not provide a story on how the injury occurred and stated they did not know how it occurred." (*Id.*)

Officer Anderson and Agent Fisher reviewed the hospital social worker's notes and Dr. Vega's consultation note. (*Id.* at 56–57.) The hospital social worker's notes indicated that "Carolina denied any knowledge of any falls or trauma." (*Id.* at 57.) Alexander also "denied any knowledge of any falls or trauma." (*Id.*)

After reviewing the notes, Officer Anderson and Agent Fisher interviewed the Hipschmans. (*Id.*) During their interview with Carolina, Carolina stated that she "believed [C.H.] may have fallen, but she did not know." (Doc. No. 163-2 at 109.) Specifically, she told Officer Anderson that "[s]he has no idea how [C.H.] could have sustained the injury." (Doc. No. 189 at 58.) Carolina went on to identify the Emma and Carolina Mat incidents

22-cv-00903-AJB-BLM

as instances where C.H. hit his head. (Doc. No. 190 at 506–07, 509.) Carolina conceded that "the doctor didn't think that [the Emma incident] would be enough." (Doc. No. 191 at 289–90.) She also described the Carolina Mat incident as one where C.H. "rolled off of [the mat] and the kind of clonked his head." (*Id.* at 290.)

"When asked how he thought [C.H.'s] injury happened, Alex[ander] replied, 'I don't know. I want to know. Seeing his CT scans . . . . Um, I am sorry, I really don't know.'" (Doc. No. 189 at 59; *see also* Doc. No. 163-2 at 115.)

The following morning, Detective Salazar and Detective Murgia took over the police investigation. (*See* Doc. No. 189 at 61.) After reviewing Officer Anderson's report, the detectives went to Rady to continue investigating. (*Id.*) According to Carolina, she told the detectives about the Crib and Carolina Mat incidents. (Doc. No. 190 at 436.) However, she may not have told the detectives about the Emma incident. (*Id.*)

Around 12:08 p.m., the detectives and Romero had a conference call with Dr. Suresh. (Doc. No. 189 at 61.) Dr. Suresh informed the detectives that "she believed the fracture was a direct impact injury" and that it "was not necessarily an abusive type injury," but she "could not determine the cause of the injury." (*Id.*) She also indicated that, "[b]ased on her experience . . . the injury was not consistent with Abusive Head Trauma." (*Id.*)

After the conference call, Detectives Salazar and Murgia went to speak to the Hipschmans with Romero. (*Id.* at 62.) According to Detective Salazar, Romero "advised [the Hipschmans that] a hold had been placed on [C.H.] by [the County] since there wasn't an explanation to how the fracture occurred by the family." (*Id.*; *see also* Doc. No. 190 at 90.) Romero further explained that the County was "still looking at options as to where to place [C.H.]" (Doc. No. 189 at 62.) Detective Salazar could not recall if Carolina provided any explanation for C.H.'s injury on June 27. (Doc. No. 163-2 at 169.)

The police ultimately concluded that there was not enough evidence to prove that C.H. suffered an abusive-type injury. (Doc. No. 190 at 122.)

22-cv-00903-AJB-BLM

**5.    The Hipschmans' account of Romero's investigation.**

On June 26, after speaking with Officer Anderson and Agent Fisher, Carolina spoke with Romero. (Doc. No. 163-2 at 20–21.) When asked if she knew what caused C.H.'s injury, Carolina responded, "I don't know specifically what caused [C.H.'s] injury. (*Id.* at 22.) However, Carolina told Romero about the Emma, Crib, and Carolina Mat incidents. (Doc. Nos. 163-2 at 22–25; 190 at 424.) Carolina indicates both that she did not tell Romero about any additional incidents and that she may have told Romero about the M.H. Mat incident. (*Compare* Doc. Nos. 163-2 at 23; 190 at 424, *with* Doc. No. 191 at 20–22.)

Alexander also spoke with Romero. (Doc. No. 163-2 at 121.) When asked what might have happened to C.H., Alexander told Romero about the Emma, Crib, and Carolina Mat incidents. (*Id.* at 121–22.) Alexander specified that Carolina told him that C.H. hit the back side of his head on the floor during the Carolina Mat incident. (*Id.* at 123.)

Later that night, according to Carolina, Romero told the Hipschmans that they could not leave the hospital with C.H. (*Id.* at 30.) In contrast, Alexander states that Romero explained that there was a possibility of a hospital hold, which "means that [Romero is] the one who decides whether or not [C.H.] goes home with [the Hipschmans] tomorrow." (*Id.* at 127.) Alexander asserts that the Hipschmans objected that they had told Romero "how [C.H.] was jumping on Emma's legs. We said how he hit his head on the crib. And we said how Carolina, like, had told me the story how he fell over. And Carolina relayed the story how [M.H.] moved [C.H.] a different time." (*Id.*)

The Hipschmans stayed in the hospital with C.H. that night. (Doc. No. 190 at 431–32.)

The following day, June 27, Romero spoke with the Hipschmans after the detectives. (*Id.* at 436.) During the conversation, Romero asked the Hipschmans for potential placement options for C.H. (*See id.* at 437.) Romero then gave Carolina a consent form that Romero said Carolina "had to sign . . . just in case of if [C.H.] needed to be seen and for the Polinsky Center -- for an intake at the Polinsky Center." (*Id.* at 442.) When asked what would happen if the Hipschmans did not sign the form, Romero told the Hipschmans

22-cv-00903-AJB-BLM

that they "had no choice" and failure to sign "would make it very difficult for [the Hipschmans] to have [their] son." (*Id.* at 444.) Carolina signed the form. (Doc. No. 189 at 64.)

Some time after the meeting, Romero informed the Hipschmans that they would not be able to take C.H. home. (Doc. No. 190 at 446–47, 534.)

Later that day, Romero interviewed M.H. with Alexander present. (*Id.* at 292–95.) M.H. identified two instances where C.H. may have injured himself. (*Id.* at 296.) M.H. first told Romero about the M.H. Mat incident—that while Carolina was in the restroom, C.H. rolled off of his play mat and M.H. bumped C.H.'s head on the ground when he tried to scoot C.H. back onto the mat. (*Id.* at 296–97.) During the M.H. Mat incident, C.H.'s head was "[w]ay less than an inch" off the ground. (*Id.* at 308–09.) M.H. had not told Alexander about this incident before the interview. (*Id.* at 528.) M.H. also told Romero about the Carolina Mat incident—where Carolina and C.H. were sitting on a play mat and C.H. fell over onto his left side. (*Id.* at 297–98.)

On June 29, Alexander emailed Romero with a summary of the Hipschmans' conversation with Dr. Plonsker and to encourage Defendants to follow up with her. (*Id.* at 65–66.)

### 6. Defendants' account of Romero's investigation.

On June 26, Defendants received a referral regarding C.H.'s injury around 4:54 p.m. (Doc. Nos. 163-2 at 58; 163-6 ¶ 4; 189 at 2–3.) The reporting party informed Defendants that a CT scan of C.H. "shows a skull fracture and bleeding." (Doc. No. 189 at 2.) According to the reporting party, "the parents do not have an explanation." (*Id.*) The reporting party nevertheless indicated that on June 25, C.H. "'slammed' his head into [Emma's] mouth, making it bleed" and that C.H. "hit his head on the inside of his crib on 06/25/2020; it is unknown where on his head." (*Id.* at 2–3.) The reporting party also stated that "the parents denied any trauma and falls and denied that the 11 year old step-brother holds the child unsupervised." (*Id.* at 3.) Defendants summarized this as "[i]t was reported

22-cv-00903-AJB-BLM

that [C.H.] has swelling to the head, bleeding, and a skull fracture with no explanation to his injuries." (*Id.*)

That afternoon, Defendants assigned a "standby worker," *i.e.*, an emergency response investigator who conducts investigations after hours, on weekends, and on holidays, to investigate. (Doc. No. 163-2 at 70–71; *see also* Doc. Nos. 163-6 ¶ 3; 190 at 321.) Specifically, Defendants assigned Romero. (Doc. No. 163-6 ¶ 5.) Throughout her investigation, Romero was supervised by Araiza. (*Id.*)

Romero initiated her investigation by attempting to call the reporting party. (Doc. No. 163-2 at 53–56.) However, Romero did not note the call attempt in her delivered services log. (*Id.* at 55.)

Upon arriving at Rady, Romero received and reviewed Dr. Vega's consultation note. (Doc. Nos. 163-2 at 68; 189 at 6.) Romero attempted to speak with the hospital social worker who had spoken with the Hipschmans, but the hospital social worker had already left for the day. (Doc. No. 189 at 8.)

Around 7:40 p.m., Romero interviewed Carolina. (Doc. Nos. 163-2 at 62; 189 at 6–8.) Carolina "denied knowing what could have happened" to cause C.H.'s injury, but mentioned the Emma incident and that it caused Emma to bleed. (Doc. Nos. 163-2 at 60; 189 at 8.) Romero's notes indicated that Carolina "denied having any knowledge, [*sic*] as to what happened to her son." (Doc. No. 189 at 7.) "When asked whom [*sic*] she believed could have caused the fracture to the baby's head[,] she said, 'I don't know.'" (*Id.* at 8.) "When asked if she could remember anything that could have happened that might have resulted in the baby being injured, she denied their [*sic*] being anything." (*Id.*)

Around 8:45 p.m., Romero spoke with Officer Anderson and Agent Fisher (*Id.* at 9.) They informed Romero that the Hipschmans "did not have any explanation for the injuries." (*Id.*)

Around 9:00 p.m., Romero interviewed Alexander. (Doc Nos. 163-2 at 63; 189 at 5, 9–11.) When Romero asked Alexander "Can you tell me how [C.H.] sustained a head fracture," Alexander "denied having any knowledge, [*sic*] as to what happened." (Doc. No.

22-cv-00903-AJB-BLM

189 at 10.) "When asked whom [*sic*] he believed could have caused the facture to the baby's head[,] he said, 'I don't know.'" (*Id.*) "When asked if he could remember anything that could have happened that might have resulted in the baby being injured, he denied their [*sic*] being anything." (*Id.*) Nevertheless, Alexander said Carolina told him about the Emma incident, but "denied knowing the specifics because he was not home at that time." (*Id.* at 11.)

Later that evening, Romero spoke with both of the Hipschmans. (Doc. Nos. 163-2 at 63; 189 at 11.) Romero explained the Defendants' concern that "no one has been able to identify whom [*sic*] or how the injury was sustained." (Doc. No. 189 at 11.) Romero asked the Hipschmans if they could remember anything further "and they both denied." (*Id.*) Romero then "explained the possibility of their [*sic*] being a hospital hold tomorrow and explained that it indicated that [Defendants] would take custody of [C.H.]" (*Id.*) Given this possibility, Romero asked the Hipschmans for potential family members or friends who could be considered for placement. (*Id.*) Romero also informed the Hipschmans that another social worker would be assigned Monday to re-assess all of the information before Defendants. (*Id.*)

On Saturday, June 27, Romero began the morning around 9:00 a.m. by speaking with Detective Murgia and a hospital social worker. (*Id.* at 13–14.) Romero also attempted to contact potential family placement options identified by the Hipschmans. (*Id.* at 13.)

Around noon, Romero met with Detective Murgia and Detective Salazar at a hospital social worker's office. (*Id.*) The four spoke with Dr. Suresh by phone. (*Id.*) During the call, Dr. Suresh "indicated that that [*sic*] the child's injury could not have been generated by the head force of him hitting the grandmother's mouth." (*Id.*) Dr. Suresh said that C.H. "did receive a force to the head, but is not clear what it could have been." (*Id.*) She also noted the injury "[c]ould have been either accidental and not being reported or non-accidental and not being reported." (*Id.*) Romero did not talk with any other medical staff about C.H. (Doc. No. 190 at 24–26.)

22-cv-00903-AJB-BLM

Around 12:40 p.m., Romero met with Detective Murgia and Detective Salazar again. (Doc. No. 189 at 15.) The detectives informed Romero that they would not be writing a criminal report. (*Id.*)

After speaking with Dr. Suresh, Romero contacted Araiza. (Doc. Nos. 163-2 at 59; 190 at 19–20.) During this conversation, Romero and Araiza used Defendants' "Structured Decision-Making" tool to complete a safety assessment for C.H. (*See* Doc. No. 163-2 at 69.) The decision to remove C.H. from the Hipschmans' custody was made after Romero consulted with Araiza. (*Id.* at 67.)

Around 1:05 p.m., Romero informed the hospital social worker that Defendants would place a hospital hold on C.H. (Doc. No. 189 at 15.)

About six minutes later, Romero spoke with the Hipschmans. (*Id.* at 15–16.) Romero informed the Hipschmans that a doctor ruled out the Emma incident being a cause of C.H.'s injury. (*Id.* at 15.) Romero also told the Hipschmans that Defendants were putting a hospital hold on C.H. and that Romero could not reach the Hipschmans' proposed family placement options. (*Id.*) Romero explained to the Hipschmans that C.H. would be taken to the Polinsky Center because no foster caretakers were available. (*Id.* at 16.)

Around 3:10 p.m., Romero removed C.H. from the Hipschmans' custody. (*Id.* at 17.)

While C.H. was "in intake" at the Polinsky Center, Defendants identified a foster caretaker for C.H. (*Id.* at 12, 17.)

Around 4:21 p.m., Romero notified Carolina that C.H. would be placed with a foster caretaker instead of at the Polinsky Center. (*Id.* at 17–18.) Romero later offered to let the Hipschmans visit with C.H. before she brought C.H. to the foster caretaker. (*Id.* at 18.) Romero also asked to speak with M.H. during the visit, which Carolina agreed to. (*Id.*) Around 5:50 p.m., the Hipschmans visited with C.H. (*Id.*)

That evening, Romero interviewed M.H. in Alexander's presence. (*Id.* at 12.) M.H. "denied being aware how [C.H.] sustained a head injury that resulted in him going to the hospital." (*Id.*)

Around 8:00 p.m., Romero dropped off C.H. with the foster caretaker. (*Id.* at 19.)

22-cv-00903-AJB-BLM

Throughout June 26 and 27, Romero consulted with Araiza by phone on at least six occasions. (Doc. No. 163-6 ¶ 7.) When they spoke each day, Romero informed Araiza "that the parents of C.H. were unable to provide any plausible explanation (accidental or inflicted) for C.H.'s injuries." (*Id.* ¶ 5.)

### 7.    The decision to remove C.H.

Romero asserts that she did not make the decision to remove C.H., and that it was up to Araiza and Araiza's manager to make the decision. (Doc. No. 163-2 at 50–51.) Nevertheless, Romero acknowledges that she played a role in the process by "provid[ing] all the information gathered" to Araiza. (*Id.* at 50.) Romero also denies that she told the Hipschmans that she would make the decision of whether C.H. would be removed. (*Id.* at 51.)

According to Araiza, "[d]ecisions in child welfare are not made by one person. It's a -- it's a consultation, policy, and [structured decision-making] assessments." (Doc. No. 190 at 322–23.) "[T]here's an investigation that happened, that facts were considered, and that policy was followed along with consultation from a [social worker], with me, and my manager, along with [a structured decision-making] assessment." (*Id.* at 323.) In this framework, Araiza "was the supervisor that agreed to a removal." (*Id.* at 322.) Araiza spoke with her manager, Le, about the information Romero collected. (Doc. No. 163-2 at 158.) Araiza and Le then made the decision to remove C.H. (*Id.* at 159.) When asked to explain Romero's involvement in the removal decision, Araiza stated that

> Well, she's the one that's gathering the information and giving it to me along with her own assessment. So then I take that assessment, I review as much information as I can, and I forward it to my manager. That's how the decision is made along with our [structured decision-making] assessment.

(*Id.*) In this process, Romero's "recommendation was to seize the child." (Doc. No. 190 at 326.)

Le indicated that, as a manager, he ultimately had "veto power . . . over the decision to remove a child." (*Id.* at 339–40.)

22-cv-00903-AJB-BLM

Araiza did not recall consulting with Padilla on the decision of whether to remove C.H. from the Hipschmans' custody. (Doc. No. 163-2 at 163.) Padilla also asserts that his role in the removal of C.H. was limited to interviewing Araiza and Romero based on a subsequent ombudsman complaint. (Doc. Nos. 163-2 at 222; 191 at 76.) Padilla additionally indicates that Le was responsible for advising Araiza because Padilla had to take the lead on the ombudsman complaint since Le was part of the consultation. (Doc. No. 163-2 at 224–25.)

Araiza also explained that Defendants could not obtain a warrant to remove C.H. on June 27, because the juvenile court only hears warrant requests on weekdays between 8:30 a.m. to 11:30 a.m. and between 1:30 p.m. to 4:00 p.m. (Doc. No. 163-6 ¶ 18.) Padilla similarly indicated that warrants are not available for standby cases. (Doc. No. 191 at 61.)

### 8. Samuels' investigation.

On Monday, June 29, Samuels took over the referral. (*See* Doc. No. 189 at 19.) In doing so, Samuels contacted Dr. Vega to follow up on the medical staff's comments (*Id.* at 20–21.) Samuels asked if C.H.'s injury could have happened by accident. (*Id.* at 20.) Dr. Vega explained that "generally a child does not suffer any injury from a short fall of 2-3 feet high. Never the less [*sic*], an injury can occur if the child fell from a height of 2-3 feet or greater." (*Id.*) Dr. Vega added that C.H.'s injury "could have occurred by impact from his head hitting the floor from a fall or if someone hit [him] directly in the head. However, at this point without a plausible explanation, it is difficult to determine." (*Id.*) Furthermore, "Dr. Vega denied that [C.H.] could have suffered a skull fracture form [*sic*] hitting his head on his crib." (*Id.*)

Samuels also asked Dr. Vega about Dr. Plonsker's examination of C.H. (*Id.* at 20–21.) Dr. Vega confirmed that Dr. Plonsker examined C.H., but could not provide Samuels with Dr. Plonsker's notes. (*Id.*) Samuels asked about Dr. Plonsker's purported statement "that there are many times the cause of such injuries are unknown and could be from anything." (*Id.* at 21.) However, Dr. Vega could not find the statement in Dr. Plonsker's notes and referred Samuels to the medical records department to obtain the notes. (*Id.*)

16

22-cv-00903-AJB-BLM

Samuels attempted to contact Dr. Plonsker on June 30. (Doc. Nos. 163-2 at 183–84; 189 at 21.)

Samuels also spoke with the Hipschmans, Thomas, Emma, and Frank. (Doc. No. 189 at 19–22.) During these conversations, the Hipschmans identified additional placement preferences for C.H. and specified that Thomas was their first choice. (*Id.* at 19–20.) Emma reported that the Emma incident occurred on June 24 and denied suffering any injuries from the incident. (*Id.* at 21.) Frank informed Samuels that the family tried to figure out how C.H. may have become injured. (*Id.* at 22.) Frank suggested that C.H. may have hit his head on his crib, but "denied ever seeing the child fall or hit his head." (*Id.*)

On June 30, Frank reiterated to Samuels that C.H. may have hit his head on his crib. (*Id.* at 24.) Sharps Pediatrics staff also informed Samuels that C.H. had a follow-up appointment at Sharps Pediatrics, which was ultimately scheduled for July 2. (*Id.* at 24–25.)

On July 2, Samuels and Carolina attended C.H.'s follow-up appointment at Sharps Pediatrics. (*Id.* at 26.)

On July 6, Samuels received amended statements from Emma and Frank. (*Id.* at 27.) Emma clarified that the Emma incident occurred on June 25, not June 24. (*Id.*) Frank corroborated this clarification by explaining that Emma did not work on June 25. (*Id.*)

On July 7, Samuels met with and interviewed Alexander at the Hipschmans' home. (*Id.* at 29–31.) During the interview, Samuels read the dependency petition that was filed with the state juvenile court on July 1 to Alexander. (*Id.* at 29.) Alexander "stated that he does not know what happened," but "expressed that these are accidents that happen all the time." (*Id.*) Alexander also noted that on June 23 or June 24, during the Crib incident, he and Carolina saw C.H. "hit his head on the left side where the skull fracture is at" on the side of his crib. (*Id.* at 30.) He additionally reported that on July 5, he learned from M.H. that C.H. "hit his head on the floor" during the M.H. Mat incident. (*Id.*) Lastly, Alexander noted that the Carolina Mat incident occurred on June 24 or June 25. (*Id.*) When Samuels

22-cv-00903-AJB-BLM

noted that Alexander was providing additional explanations, Alexander responded that he and Carolina previously discussed the incidents with Romero. (*Id.*)

Samuels also met with and interviewed Carolina. (*Id.* at 38–42.) After Samuels read the filed dependency petition to Carolina, Carolina "expressed that she did not have an explanation and that is [*sic*] hard to catch everything." (*Id.* at 40.) Carolina added "that there have been a couple of times where she turned her head and [C.H.] had thrown himself back and hit the side of his head." (*Id.*) Carolina also told Samuels about the M.H. Mat, Carolina Mat, Crib, and Emma incidents. (*Id.* at 40–41.) Carolina reported that that when she returned from the bathroom during the M.H. Mat incident, C.H.'s head was "cocked back." (*Id.* at 40.) M.H. told her that C.H. had "rolled off the mat." (*Id.*) On July 3, M.H. told Carolina that "he hit the baby's head on his the [*sic*] 1/2 inch thick mat pretty hard." (*Id.* at 41.) After telling Samuels about the four incidents, Carolina asserted "that a lot of this information was provided to . . . Romero." (*Id.* at 42.)

Additionally, Samuels interviewed M.H. (*Id.* at 31–32.) M.H. denied seeing C.H. fall or hurt himself before. (*Id.* at 32.) However, when prompted that the Hipschmans indicated something different, M.H. reported that he was present when C.H. fell and bumped his head on the floor. (*Id.*)[4]

Samuels received several emails from Alexander that day. In one email, Alexander detailed the Hipschmans' disagreements with the contents of the detention report Defendants filed with the dependency petition. (*Id.* at 33–38.) As relevant here, Carolina indicated that she reported the Emma, Crib, and M.H. Mat incidents to Romero and that she "gave several events that occurred in which some were not even noted on this report that may or may not have been the cause for [C.H.'s] injury." (*Id.* at 33–35.) The Hipschmans asserted that Romero did not explain the possibility that there would be a hospital hold for C.H., but conceded that Romero asked for potential placement options.

---

[4]    It is not clear if M.H. was referring to the Carolina Mat incident; the M.H. Mat incident; or a third, unidentified event. (*See id.*)

(*Id.* at 36–37.) Carolina also indicated that Romero said "I determine whether or not your child stays here or goes home with you and your husband." (*Id.* at 37.)

The Hipschmans also complained that they were never informed of a "said appt" until after reading about it in a report. (*Id.* at 38.)[5] They additionally indicated that, on July 2 at 5:50 p.m., Samuels "barely confirmed" appointments for C.H. on July 9 at 10:00 and 11:30. (*Id.*)

In a second email, Alexander explained that the Hipschmans "noticed two large scratches near [C.H.'s] hip and on his upper leg" during a visit. (*Id.* at 28–29.) Alexander included images that showed C.H. "on the right lower hip/stomach area" with "two small red scratches, one located on the crease of the hip and thigh. The other scratch was on the lower side abdomen close to the other scratch." (*Id.* at 28.)

On July 8, Defendants placed C.H. with Thomas and transferred C.H. from the foster caretaker's home. (*Id.* at 42.)

On July 9, Samuels interviewed Emma, who reported that she confused her dates in her initial statement and clarified that the Emma incident occurred on June 25. (*Id.* at 45.)

That same day, Alexander emailed Samuels to discuss C.H.'s appointments. (*See id.* at 44–45.) Alexander emphasized that

> [a]ll of the possible incidents that involved [C.H.] (head hitting crib, falling off over mat, and 11-year old moving him and hitting his head) WERE NOT included in the Detention Report, but WERE told to the first [social worker] (Nidia Romero) when Carolina and I were interviewed the evening we brought [C.H.] to the hospital.

(*Id.* at 44.)

On July 10, Samuels spoke with Dr. Plonsker. (*Id.* at 46.) Although Dr. Plonsker could not recall specifically what she told the Hipschmans, she recalled them saying that C.H. hit his head on the crib. (*Id.*) Dr. Plonsker also clarified that while the pattern of C.H.'s

---

[5] It is not clear what the Hipschmans meant by "said appt." (*See id.*)

injury is common in his age group, "she did not say that the cause of the injury is often unknown." (*Id.*) Additionally, she recommended a nonaccidental trauma work up because there was "no known mechanism of the child's injury." (*Id.*)

The following day, Dr. Suresh emailed Samuels to clarify that C.H.'s "injury was from impact" and "could have occurred by accidental or abusive means." (*Id.*) However, Dr. Suresh "did not feel it was plausible that [C.H.] bumping his head against [Emma's] face/mouth would cause [the] injury." (*Id.*)

On July 12, Thomas emailed Samuels to express that he was "uncomfortable that [Samuels] took at least one picture of [C.H.'s] genitals" when she examined the scratches near C.H.'s groin. (*Id.* at 47.)

On July 14, the hospital social worker who spoke with the Hipschmans on June 26 emailed Samuels. (*Id.* at 47–48.) The hospital social worker explained that she was notified that C.H. had "a skull fracture with a bleed and no known knowledge of how it occurred." (*Id.*) However, she noted that Carolina mentioned the Emma incident, but Carolina "acknowledged that [C.H.] hitting his head on [Emma's] lip probably could not have caused the injury." (*Id.* at 48.)

The next day, Samuels told Thomas that "it is protocol for social worker [*sic*] to photograph any injuries." (*Id.* at 183.) Samuels noted that "the location of the alleged injury was in [C.H.'s] hip area," so Samuels "was not specifically trying to photograph [C.H.'s] genitals." (*Id.*)

### 9.  The initial dependency proceedings.

On July 1, Defendants filed a dependency petition and detention report with the juvenile court. (Doc. Nos. 163-2 at 177–78; 189 at 66–86, 88–91.) Both Samuels and Shehee signed the detention report. (Doc. Nos. 163-2 at 179; 189 at 86.)

The report explained that C.H. was admitted to Rady on June 26 "due to an unexplained skull fracture with bleeding." (Doc. No. 189 at 68.) It added that Defendants were "worried that [C.H.] will continue to be exposed to severe injury while in the care of the parents, which could lead to further life threatening injuries, including death." (*Id.*)

20

22-cv-00903-AJB-BLM

Further, the Hipschmans' "explanation for the injury to the child is questionable or inconsistent with the type of injury, AND the nature of the injury suggests that the child's safety may be of immediate concern." (*Id.*)

In summarizing the initial referral to Defendants, the report indicated that

> [t]he parents did not have a plausible explanation for the injuries. The parents report that the day prior (06/25/2020) the child slammed his head into the maternal grandmother's mouth causing the grandmother's mouth to bleed. It was also reported that the child his head [*sic*] on the inside of his crib.

(*Id.* at 68–69.)

On Romero's interviews with the Hipschmans, the report noted that "[t]he mother denied having any knowledge as to what happened to the child" and that "[w]hen asked if she could remember anything that could have happened that might have resulted in the baby being injured, she denied their [*sic*] being anything." (*Id.* at 69.) Meanwhile, Alexander "denied having any knowledge, [*sic*] as to what happened" and "denied [C.H.] scooting himself and falling off the bed or hitting himself on the bed with anything." (*Id.* at 69–70.) However, the report explained that the Hipschmans reported the Emma and Crib incidents. (*Id.* at 69.)

Dr. Vega's consultation note was also quoted as saying C.H.'s

> injury would have been caused by direct impact to the left side of his skull. In a young infant who requires constant supervision, the events leading to this severe injury would have been readily apparent to any prudent caregiver. In the absence of a plausible explanation, this injury is highly concerning for non-accidental trauma.

(*Id.* at 70.) The report also explained that Dr. Suresh "indicated that that [*sic*] the child's injury could not have been generated by the head force of him hitting the grandmother's mouth." (*Id.*)

Turning to Samuels' investigation, the report noted that Dr. Vega explained that C.H.'s injury could have occurred "from a fall, however that explanation was not provided by the parents" and that "generally a child does not suffer any injury from a short fall of 2-

3 feet high. Never the less [*sic*], an injury can occur if the child fell from a height of 2-3 feet or greater." (*Id.* at 71.) The report also included Dr. Vega's explanation that C.H.'s injury "could have occurred by the impact from his head hitting the floor from a fall or if someone hit the child directly in the head," but that there was no "plausible explanation." (*Id.*) Additionally, Dr. Vega could not corroborate Dr. Plonsker's purported comments using Dr. Plonsker's notes. (*Id.*)

The report also included details from Samuels' interviews with Emma and Frank, specifically Emma's recollection that the Emma incident occurred on June 24 and her denial that the incident caused her mouth to bleed, as well as Frank's suggestion that C.H. may have hit his head on the crib. (*Id.* at 71–73.)

The report's analysis was summarized as

[t]he parents have provided statements and explanations of how the child could have possibly suffered the skull fracture. However, after the child was examined by a medical professional and the parent statements were taken into account, it was determined that the explanations given by the parents were not consistent with the injuries that occurred to the child.

(*Id.* at 73.) In particular, the report pointed out the discrepancy between the Hipschmans' account that the Emma incident occurred on June 25 and caused Emma's mouth to bleed, and Emma's account that the Emma incident occurred on June 24 and did not cause her any injury. (*Id.* at 73–74.)

The report included a section summarizing Romero's and Samuels' interviews. (*Id.* at 75–83.) However, the report did not mention either the Carolina Mat or M.H. Mat incidents, nor did it mention Romero's interview with M.H. (*See id.* at 66–86.) It ultimately recommended that the juvenile court make certain findings, including that C.H. remain in Defendants' custody. (*Id.* at 84–86.)

Based on the detention report, the juvenile court determined that Defendants should retain custody of C.H. (*Id.* at 93–95.) In doing so, the juvenile court "AUTHORIZE[D] PARENTS TO BE PRESENT AT MEDICAL APPOINTMENTS FOR THE MINOR." (*Id.* at 94.)

22-cv-00903-AJB-BLM

### 10.     The Hipschmans' account of C.H.'s medical examinations while in Defendants' custody.

According to Carolina, after Romero removed C.H. from the Hipschmans' custody, Romero told Carolina that "they had just finished an intake exam on" C.H. at Polinsky Center. (Doc. No. 191 at 12.)

In early July, C.H. had a routine post-emergency room visit with his pediatrician, which Carolina attended. (Doc. Nos. 163-2 at 40; 190 at 460.)

On July 7, the Hipschmans observed two scratches near C.H.'s groin. (Doc. Nos. 163-2 at 35–36; 189 at 28–29.) The Hipschmans notified Samuels of the scratches and raised concerns about the care provided by the foster caretaker. (Doc. Nos. 163-2 at 36–37; 189 at 28–29.) Around July 12, Samuels took photos of the scratches. (Doc. Nos. 189 at 47, 183.)

On July 9, C.H. had two appointments at the Chadwick Center: a full-body scan with the radiology department (the "skeletal survey") and a follow-up visit (the "general examination"). (Doc. No. 163-2 at 42–43.) Carolina objected to the skeletal survey to Samuels, but nevertheless accompanied C.H. for the scan. (Doc. No. 190 at 462–63.) Carolina states that only Thomas was allowed to accompany C.H. for the general examination because Samuels stopped Carolina from entering the room. (Doc. Nos. 163-2 at 44; 190 at 463; *see also* Doc. No. 163-2 at 45 ("But I did ask the front girl [*sic*] if I could go in there and she said that's not a problem. But [Samuels] told me I couldn't go in there.").) After the general examination, Carolina spoke with Dr. Vega. (Doc. No. 190 at 464–65.) Dr. Vega informed Carolina that the medical staff were going to recommend "dismissal for these charges. We do believe that his injuries were accidental and not caused by neglect or abuse." (*Id.* at 465.)

That evening, Alexander emailed Samuels that "Carolina was not allowed the right to be present during [C.H.'s] appointment at the Chadwick Center." (Doc. No. 189 at 44.) Alexander acknowledged "that there are certain policies at a hospital or a medical facility,

22-cv-00903-AJB-BLM

especially during a pandemic." (*Id.*) Additionally, Alexander asserted that Dr. Vega told Carolina that C.H. "falling over off the mat could have caused the facture." (*Id.*)

### 11. Defendants' account of C.H.'s medical examinations while in Defendants' custody.

In early July, C.H. had a "well-child exam" with his pediatrician. (Doc. No. 190 at 483.) Samuels and Carolina attended the appointment. (*Id.*)

Samuels' notes concede Samuels examined and photographed the scratches near C.H.'s groin. (Doc. No. 189 at 183.)

At some point, Rady staff ordered the skeletal survey and general examination. (Doc. No. 190 at 483–84.) Samuels did not attend either the skeletal survey or the general examination. (*Id.* at 486.)

### 12. Medical staffs' account of C.H.'s medical examinations while in Defendants' custody.

No party has provided records from C.H.'s early July examination.

On July 9, the skeletal survey was performed on C.H. to see if an earlier scan presented a false negative for additional injuries. (*See* Doc. No. 163-2 at 151.)

That same day, Dr. Ayson and Dr. Vega conducted the general examination at Chadwick Center. (Doc. Nos. 163-2 at 86; 189 at 97–101.) At that time, the hospital had COVID precautions in place that would limit the number of people present in an examination room. (Doc. No. 163-2 at 92–93.) However, Dr. Ayson's notes indicate that both Thomas and Carolina were present during the general examination, stating "[s]upport person present during exam: paternal grandfather, mother." (Doc. Nos. 163-2 at 230; 189 at 97.)

The notes also explained that Defendants informed Dr. Ayson and Dr. Vega that Alexander identified the Crib, M.H. Mat, and Carolina Mat incidents as possible causes of C.H.'s injury. (Doc. Nos. 163-2 at 230–31; 189 at 97.) Defendants reported to medical staff that Carolina also identified the M.H. Mat, Carolina Mat, and Crib incidents as possible causes. (Doc. Nos. 163-2 at 231; 189 at 97–98.) The notes relayed that Carolina learned

that C.H hit his head during the M.H. Mat incident on July 3. (Doc. No. 163-2 at 231.) Additionally, Defendants told Dr. Ayson and Dr. Vega that M.H. initially denied knowledge of any trauma during a June 27 interview, but later stated that C.H. fell sideways while sitting on his floor mat during a July 7 interview. (Doc. Nos. 163-2 at 231; 189 at 98.)

When Dr. Ayson and Dr. Vega spoke with Carolina around the time of the general examination, Carolina "corroborated the history provided to [Defendants]." (Doc. Nos. 163-2 at 231; 189 at 98.)

Dr. Vega summarized her conclusions as

[C.H.'s] head injuries would have been caused by direct impact to the left side of his skull. In early-mobile infants, these types of injuries generally occur accidentally from a short fall. The parents have provided additional history which includes an event where [C.H.] fell from sitting position and hit the left side of his head onto a wooden floor. This would be a plausible explanation for [C.H.'s] head injuries. Additionally, because the child promptly returned to baseline and no injuries were noted, it is conceivable that the parents would not have perceived this event or other reported incidents of head trauma to be significant enough to seek medical attention nor mention this history during [C.H.'s] initial evaluation. Notably, when the child developed symptoms (head swelling, persistent fussiness), the parents sought medical attention. For these reasons, the parents [*sic*] response does not represent medical neglect. In many similar situations with this type of skull fracture, head swelling is the first noted symptom and can actually take multiple days to develop to a noticeable degree.

(Doc. Nos. 163-2 at 233; 189 at 100.)

### 13.   The termination of dependency proceedings.

On July 17, Samuels completed an addendum report for the juvenile court. (Doc. No. 189 at 103–20.) The addendum explained that Defendants had "received new information regarding the potential causes of the child, [C.H.'s,] head injury, and respectfully recommend[ed] that the dependency petition for [C.H.] be dismissed." (*Id.* at 104.) Specifically, the addendum stated that

[b]ased upon the evidence and increased timeline provided, the medical

22-cv-00903-AJB-BLM

experts were able to make a final determination that the injury was not due to abuse and/or neglect. Based upon the information that the child is not a stable sitter, he may have fallen or tipped over and hit his head, causing the injury, [Defendants are] requesting to dismiss the petition.

(*Id.* at 111.)

On August 4, the juvenile court dismissed the dependency petition for C.H. (*Id.* at 124–25.)[6]

### B.     Procedural Background

The Hipschmans initiated this action in 2022. (Doc. No. 1.) Following two amendments to the complaint (*see* Doc. Nos. 24; 72), the Hipschmans seek partial summary judgment (Doc. No. 167) and Defendants have requested summary judgment on all claims (Doc. Nos. 163; 164). Defendants have additionally moved to exclude portions of the Hipschmans' experts' opinions and testimony. (Doc. Nos. 159; 160.)

This Omnibus Order follows.

## II.     LEGAL STANDARD

### A.     *Daubert* Motions

Federal Rule of Evidence 702 governs the admissibility of expert testimony. Pursuant to the Rule,

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
(a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b)     the testimony is based on sufficient facts or data;
(c)     the testimony is the product of reliable principles and methods; and
(d)     the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

---

[6]     The juvenile court was closed between Monday, July 20, and Friday, July 31, due to the COVID-19 pandemic. (*Id.* at 122.)

22-cv-00903-AJB-BLM

Prior to admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592–93 (1993). The trial court acts as a "gatekeeper" by making a preliminary determination of whether the expert's proposed testimony is not only relevant, but reliable. *Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 463 (9th Cir. 2014), *overruled in part on other grounds by United States v. Bacon*, 979 F.3d 766 (9th Cir. 2020). This two-step assessment requires consideration of whether (1) the reasoning or methodology underlying the testimony is scientifically valid (the reliability prong); and (2) whether the reasoning or methodology properly can be applied to the facts in issue (the relevance prong). *Daubert*, 509 U.S. at 592–93; *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998).

The proponent of the expert testimony has the burden of proving that the proposed testimony is admissible under Federal Rule of Evidence 702, *Daubert*, and its progeny. *Lust ex rel Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). This means "the district court can exclude [an expert's] opinion if the expert fails to identify and defend the reasons" for his conclusions. *Id.* Where the expert's testimony is not the product of peer-reviewed research produced outside the course of litigation, "the expert 'must explain precisely how [he] went about reaching [his] conclusions and point to some objective source . . . to show that [he has] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in [his] field.'" *Id.* at 597 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1318–19 (9th Cir. 1995)).

In general, the *Daubert* analysis focuses on the principles and methodology underlying an expert's testimony, not on the expert's ultimate conclusions. *Daubert*, 509 U.S. at 595. However, the Supreme Court has cautioned that "conclusions and methodology are not entirely distinct from one another." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). As such, a "court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*

22-cv-00903-AJB-BLM

Pursuant to the Court's rules, motions "addressing the qualifications or testimony of a proposed expert must be brought by the dispositive motion hearing cut-off. They will not be entertained as motions in limine." J. Battaglia Civ. Case Proc. § III.I.

## B.   Motions for Summary Judgment

Granting summary judgment under Federal Rule of Civil Procedure 56 is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 319, 327 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant has the initial burden of demonstrating that summary judgment is proper. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970). The burden then shifts to the opposing party to provide admissible evidence beyond the pleadings to show that summary judgment is not appropriate. *See Celotex*, 477 U.S. at 322, 324. The opponent must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996). In considering evidence during the summary judgment stage, courts do not weigh conflicting evidence or make credibility determinations. *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). Instead, courts draw all inferences in the light most favorable to the non-moving party. *Id.*

## III.   DISCUSSION

### A.   Evidentiary Motions and Requests

#### 1.   Motions to Exclude

##### a.   Melinda Murphy, M.A.

The Hipschmans have retained Murphy as a social work expert to opine on

the standard of care and practice in child abuse investigations, training, planning, policy, evaluating, decision making related to child abuse and child

abuse investigations, and related issues and topics regarding Defendants [*sic*] conduct in this case in relation to the unwarranted seizure of the Hipschman's [*sic*] child as well as the unwarranted and non-consensual medical exams and treatments inflicted upon him by Defendants and/or at their direction.

(Doc. No. 159-2 at 8 ¶ 2.) The Hipschmans also anticipated that Murphy may address matters and opinions "advanced by other experts on similar or related subjects in this action." (*Id.*)

Defendants object to a number of Murphy's opinions offered in her expert report and testimony, including

1. Opinions that certain conduct by the social worker(s) "shocked my conscience" and that the social worker(s) displayed "deliberate indifference."
2. Opinions that Social Workers Romero and Padilla are/were "dishonest."
3. Opinions that Social Worker Samuels "deliberately" and/or "recklessly" misled the Juvenile Court.
4. Opinions that C.H. (who is not a Plaintiff) has suffered "trauma of seizure" of separating a child from his parent that can include "eneurisis (the inability to control urination), encopresis (the inability to control bowels), anxiety, depression, self-injurious behaviors such as cutting, diet disturbances, sleep disturbances, hostile behavior, aggressive behavior, and can harm their ability to form relationships in the future.
5. Opinions regarding Plaintiff Carolina Hipschman's ability to breastfeed.
6. Opinions regarding any emotional and/or physical symptoms or injuries sustained by Plaintiff Carolina Hipschman.
7. Opinions that Plaintiff Alexander Hipschman has been "affected" by the seizure of his son.

(Doc. No. 159-1 at 2–3.) Defendants contend these opinions are improper legal conclusions, improper opinions on witness credibility, beyond the scope of Murphy's expertise, lack foundation, irrelevant, and more prejudicial than probative. (*Id.* at 3.)

The Court agrees that Murphy's opinions on these subjects are not admissible.

Beginning with Murphy's opinions that social workers' conduct "shocked [her] conscience" and displayed "deliberate indifference" (item 1) and that Samuels "deliberately" and/or "recklessly misled the juvenile court (item 3), the Hipschmans

22-cv-00903-AJB-BLM

contend that these are admissible opinions that "describe[] deviations from child welfare standards . . . within [Murphy's] expertise, not legal liability." (Doc. No. 173 at 13–14.) The Hipschmans add that this terminology is "context-specific to child welfare, not intended to mirror legal standards." (*Id.* at 14 (citing Doc. No. 173-1 ¶ 14).)

Pursuant to Federal Rule of Evidence 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue." Nevertheless, "an expert witness cannot give an opinion as to her *legal conclusion*, *i.e.*, an opinion on an ultimate issue of law." *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) (quoting *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004)). This is because "[w]hen an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's." *Id.* (quoting *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994)). Nevertheless, "it is sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard." *Id.* at 1198. Thus, "if the terms . . . do not have a specialized meaning in law and do not represent an attempt to instruct the jury on the law, or how to apply the law to the facts of the case, the testimony is not an impermissible legal conclusion." *Id.* at 1198–99.

Murphy's chosen language is improper and will be excluded. "To show a violation of the right to familial association under the Fourteenth Amendment . . . , a plaintiff must establish that an officer's conduct 'shocks the conscience.'" *Scott v. Smith*, 109 F.4th 1215, 1228 (9th Cir. 2024) (quoting *Nicholson v. City of Los Angeles*, 935 F.3d 685, 692 (9th Cir. 2019)). "Deliberate indifference" is a subset of the "shocks the conscience" standard. *Porter v. Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008). "Deliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions." *Gantt v. City of Los Angeles*, 717 F.3d 702, 708 (9th Cir. 2013). Under these circumstances, the terms "shocked [her] conscience," "deliberate indifference," "deliberate," and "reckless" are clearly specialized legal terms when used in this matter. These terms go to the crux of this matter; they are not merely "ancillary to the ultimate issue[s]." *Cf. Hangarter*, 373 F.3d

22-cv-00903-AJB-BLM

at 1017. Accordingly, Murphy's use of these terms invades the province of the jury and Murphy is prohibited from using the phrases. *Diaz*, 876 F.3d at 1197.

Turning to Murphy's opinions on whether any of the social workers were dishonest (items 2 and 3), the Hipschmans assert that Murphy is merely providing "evaluations of professional compliance" that are "relevant to the judicial deception claim." (Doc. No. 173 at 15.)

To the extent the Hipschmans seek to preserve Murphy's opinions on the credibility of the social workers to address Claim 3 and Count 3 of Claim 4, such opinions are moot in light of the Court's grant of summary judgment to Defendants on both Claim 3 and Claim 4, Count 3. (*Infra* at 59–65, 71.) Even if Murphy's opinions are not moot, the Ninth Circuit has long recognized that "credibility is a matter to be decided by the jury." *United States v. Sanchez*, 176 F.3d 1214, 1224 (9th Cir. 1999) (citing cases). Experts like Murphy consequently are "not permitted to testify specifically to a witness' credibility." *United States v. Candoli*, 870 F.2d 496, 506 (9th Cir. 1989).

Next, Murphy's opinions on the removal's impact on C.H. (item 4), are irrelevant, beyond the scope of her expertise, and unduly confusing. Although the Hipschmans assert that "Murphy's trauma-related opinions have adequate foundation," they fail to explain how Murphy's opinion regarding potential traumatic effects to C.H. is relevant here. (Doc. No. 173 at 15–16; *see also* Doc. No. 173-1 ¶¶ 19–22.) The Hipschmans also concede that Murphy cannot provide "specific diagnoses," meaning Murphy is not qualified to connect any potential effects C.H. has or has not experienced to the removal. (Doc. No. 173 at 16.) In turn, Murphy's discussion of potential impacts on C.H. risks confusing the issues before the jury. Fed. R. Evid. 403.[7]

Murphy's discussion of the removal's impacts on Carolina and Alexander (items 5–7), is also inadmissible. Murphy states in her report that Carolina's "milk supply had

---

[7] The Hipschmans apparently intend to conflate the potential impacts on C.H. with the Hipschmans' damages by claiming "these opinions contextualize family-wide harm." (Doc. No. 173 at 16.)

22-cv-00903-AJB-BLM

dwindled" and that M.H. testified that Carolina "is sad and becomes emotional to where she cries." (Doc. No. 159-2 at 43.) Murphy adds that Alexander was "affected" and his "employment was hampered" (*Id.*) These statements must be excluded.

First, Murphy is not qualified to testify to the impacts of C.H.'s removal on the Hipschmans. The Hipschmans did not qualify Murphy to opine on the removal's impacts. (*See id.* at 8 ¶ 2.) Thus, Murphy's opinions connecting the removal to Carolina's "dwindled" milk supply and Alexander being "affected" go beyond the scope of her expertise. *Cf., e.g.*, *Brown v. Google, LLC*, 20-cv-3664-YGR, 2022 WL 17961497, at *11 (N.D. Cal. Dec. 12, 2022) (explaining expert "opinion must be rooted in the expert's relevant expertise."). Indeed, Murphy tacitly concedes that these opinions veer outside her lane because her "focus is on social work failures and their broader impacts – not the specific impacts the Defendants' conduct had on Mrs. Hispchman." (Doc. No. 173-1 ¶ 22.)

Second, Murphy's parroting of M.H.'s testimony is also improper. A "party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of [her] testimony." *Marvel Characters, Inc. v. Kirby*, 726 F.3d 119, 136 (2d Cir. 2013) (quoting *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 666 (S.D.N.Y. 2007)). Since Murphy is not qualified to opine on the removal's impacts on the Hipschmans, her inclusion of M.H.'s testimony in her report appears to be nothing more than a naked attempt to introduce hearsay improperly.

Accordingly, Defendants' motion to exclude portions of Murphy's opinions and testimony is **GRANTED**.

### b.   Stephen Papaleo, Ph.D.

The Hipschmans have retained Dr. Papaleo as a specialist in "the clinical and forensic assessment and treatment of the victims of traumatic or stressful events." (Doc. No. 160-2 at 8–9 ¶ 3.) Accordingly, Dr. Papaleo would "provide his opinions and conclusions regarding the nature and extent of the injuries suffered by the Plaintiffs as a result of the alleged misconduct of the Defendants," including "the diagnoses, prognoses, and anticipated cost of future necessary mental health care services for Plaintiffs." (*Id.*)

Defendants object to a number of Dr. Papaleo's opinions offered in his expert report and testimony, including

1. Opinions about Defendant Nidia Romero's conduct as a social worker.
2. Opinions about Defendant Elizabeth Samuels' conduct as a social worker.
3. Opinions about child abuse pediatrician Sarah Vega, M.D.'s deposition testimony.
4. Opinions about neurosurgeon Jillian Plonsker, M.D.'s role in the child welfare investigation.
5. Opinions regarding C.H.'s "loss" or any other damages related to C.H.
6. Opinions regarding credibility of certain parties in the case.
7. Opinions that Plaintiff Carolina Hipschman is not employable.
8. Opinions that Ketamine is a recommended option to treat Carolina Hipschman's current symptoms.

(Doc. No. 160-1 at 3.) Defendants contend these opinions are improper opinions on witness credibility, beyond the scope of Dr. Papaleo's expertise, lack foundation, irrelevant, and more prejudicial than probative. (*Id.*)

The Court agrees that a majority of these opinions are not admissible.

Starting with Dr. Papaleo's discussion of the Individual Defendants' conduct (items 1 and 2), the Hipschmans do not assert that Dr. Papaleo is qualified to opine on the Individual Defendants' conduct. (*See* Doc. No. 173 at 17–18.) Instead, the Hipschmans highlight that Dr. Papaleo's qualifications "relate[] to assessing psychological harm." (*Id.* at 18.) Nevertheless, the Hipschmans defend Dr. Papaleo's characterizations of the Individual Defendants' conduct as being "contextual to explaining the cause of the trauma Mrs. Hipschman suffered, not assessments of professional standards." (*Id.* (citing Doc. No. 173-2 at 74–76).)

The Court disagrees. The statements identified by Defendants go beyond providing context and instead offer opinions that Dr. Papaleo is not qualified to provide. For instance, Defendants object to Dr. Papaleo's statements indicating that Romero "only had 'speculative concerns'" and that "there was no legitimate concern that the parents had or would abuse their child." (Doc. No. 160-1 at 4 (quoting Doc. No. 160-2 at 33, 35).) However, the Hipschmans have not qualified Dr. Papaleo to opine on the legitimacy or the

quality of a social worker's concerns when investigating potential child abuse. (*See* Doc. No. 160-2 at 8–9 ¶ 3.) Thus, Dr. Papaleo's characterizations are not "rooted" in his relevant expertise and must be excluded. *See Brown*, 20-cv-3664-YGR, 2022 WL 17961497, at *11.

Turning to Dr. Papaleo's discussion regarding Dr. Vega and Dr. Plonsker (items 3 and 4), it is not clear to that Dr. Papaleo offers any opinions about the doctors, their conduct, or their statements. In particular, Defendants highlight Dr. Papaleo's statements that "[i]t is important to restate that at the outset of the family's ordeal, Jillian Plonsker, M.D., the Neurosurgeon, found no evidence that child abuse had occurred" and that

> Dr. Vega testified she did not have enough information on June 26, 2020, to conclude one way or another whether the bump on [C.H.'s] head had been caused by accidental or non-accidental means. She also testified that a fall-over from a sitting position to the floor could explain the injury.

(Doc. No. 160-1 at 6 (quoting Doc. No. 160-2 at 33, 35).) It appears these statements merely quote or paraphrase statements made by Dr. Plonsker and Dr. Vega. Additionally, rather than simply parroting Dr. Plonsker's deposition testimony, Dr. Papaleo connected her purported finding to his analysis. For example, Dr. Papaleo noted that Carolina told Romero about Dr. Plonsker's assessment and felt that Romero "refused to accept this account." (Doc. No. 173-2 at 78–79.) In turn, Carolina felt that "she had already been found 'guilty'" by the social workers. (*Id.* at 79.) Such a connection can be reasonably inferred between Dr. Vega's testimony and Carolina. Accordingly, the Court sees no reason to exclude these statements. *Cf. Marvel Characters*, 726 F.3d at 136.

As for Dr. Papaleo's opinions about C.H.'s "loss" or damages (item 5), the Court agrees the opinions are not admissible. The Hipschmans defend Dr. Papaleo's "discussion of C.H.'s potential developmental impacts" as a way to "contextualize[] the mother's psychological harm." (Doc. No. 173 at 20.) However, a review of Dr. Papaleo's expert report shows that Dr. Papaleo does not connect C.H.'s potential developmental impacts to Carolina's asserted harms. (*See generally* Doc. No. 173-2 at 63–90.) Dr. Papaleo's report discusses the impacts of the removal on Carolina for multiple pages. (*See id.* at 76–84.) It

is only at the end of this section that Dr. Papaleo turns to the potential impacts on C.H. (*Id.* at 84.) Tellingly, instead of connecting the potential impacts on C.H. to the effects on Carolina, Dr. Papaleo concludes this portion by stating that "the extent to which, if any, [C.H.] may have been negatively impacted by his separation from his mother cannot yet be determined." (*Id.*) Thus, these opinions are neither contextual nor relevant.

Moving on to Dr. Papaleo's opinions on the credibility of certain parties (item 6), Dr. Papaleo is prohibited from opining on the credibility of other witnesses and parties for the same reason as Murphy. *Sanchez*, 176 F.3d at 1224; *Candoli*, 870 F.2d at 506.

Regarding Dr. Papaleo's conclusion that Carolina is "not employable" (item 7), the Hipschmans go to great lengths to argue that the opinion is relevant. (*See* Doc. No. 173 at 20–21.) The Hipschmans add that the conclusion "is based on clinical observations and standardized tests." (*Id.* at 19.) Finally, the Hipschmans assert that this opinion "falls within his expertise." (*Id.* (citing *Hangarter*, 373 F.3d at 1016).) But unlike in *Hangarter* where the proponent was able to establish that the proposed expert had knowledge, skill, and experience to opine "on the practices and norms of insurance companies in the context of a bad faith claim," 373 F.3d at 1016, the Hipschmans do not point to any knowledge, skill, or experience that qualifies Dr. Papaleo to comment on a person's employability. (*See generally* Doc. No. 173 at 19–21.) The Hipschmans have accordingly failed to demonstrate that Dr. Papaleo's opinion on Carolina's employability is admissible. *Lust*, 89 F.3d at 598.

Lastly, the Court concludes that Dr. Papaleo's recommendation that Carolina "consider" ketamine infusion treatment (item 8) is admissible. The Hipschmans assert that Dr. Papaleo's suggestion that Carolina consider ketamine treatment "is grounded in professional literature on PTSD therapies" and "fall within his expertise" and will help the jury understand "the extent of Plaintiffs' psychological harm." (Doc. No. 173 at 19, 21.) Defendants respond that Dr. Papaleo's suggestion should be excluded because he is not recommending that Carolina pursue ketamine treatment. (Doc. No. 160-1 at 8 (citing Doc. No. 160-2 at 56–57).) The Court disagrees. Dr. Papaleo's suggestion is relevant because it probes the potential outer bounds of Carolina's damages. Defendants can alleviate any

35

22-cv-00903-AJB-BLM

alleged risk of confusion on cross-examination by inquiring into whether or not such treatments are necessary and the treatments Dr. Papaleo actually does recommend.

Accordingly, Defendants' motion to exclude portions of Dr. Papaleo's opinions and testimony is **GRANTED IN PART and DENIED IN PART**.

### 2.    Request for Judicial Notice

Defendants request that the Court "take judicial notice of the contents" of certain documents filed in the juvenile court dependency proceedings for C.H. (Doc. Nos. 163-3 at 2; 164-3 at 2.) Defendants assert that judicial notice "is proper because public records are the types of documents that are properly noticed under [Federal Rule of Evidence] 201." (Doc. Nos. 163-3 at 3; 164-3 at 3.)

The Hipschmans object to Defendants' request, arguing that the Court "*cannot* take judicial notice of the truth of any facts or findings recited in a another [*sic*] court's opinion, orders, or court filed documents" and that judicial notice is "improper where the facts are reasonably subject to dispute." (Doc. No. 175-3 at 4.) The Hipschmans add that Defendants have failed to authenticate the identified documents and to overcome potential hearsay objections. (*Id.* at 7.)

Pursuant to Federal Rule of Evidence 201, courts "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." "Accordingly, '[a] court may take judicial notice of matters of public record . . . .' But a court cannot take judicial notice of disputed facts contained in such public records." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001)). Granting judicial notice provides a substantial benefit in cases such as this one. "In a civil case, the court must instruct the jury to accept the noticed fact as conclusive." Fed. R. Evid. 201(f).

The Court **DENIES** Defendants' request. As the Ninth Circuit explained, "a court cannot take judicial notice of disputed facts contained in . . . public records." *Khoja*, 899

22-cv-00903-AJB-BLM

F.3d at 999. The Hipschmans challenge many of the purported facts presented in the dependency proceedings. (*See, e.g.*, Doc. No. 175 at 31–35 (alleging documents filed in dependency proceedings constitute judicial deception).) Defendants' request that the Court "take judicial notice *of the contents*" (Doc. Nos. 163-3 at 2; 164-3 at 2 (emphasis added)) of the juvenile court filings is consequently inappropriate. *See Khoja*, 899 F.3d at 999.

Nevertheless, the Court accepts the juvenile court records for the limited purpose of adjudicating the cross-motions for summary judgment. *See* Fed. R. Civ. P. 56(c). The Court notes that the Hipschmans have offered filings from other court proceedings for the same purpose. (*See* Doc. Nos. 167-3 at 48–50; 190 at 515–20.)

### 3.   Evidentiary Objections

The parties raise a number of objections to the evidence submitted in support of their opposing cross-motions. (Doc. No. 175 at 43–44; 186-1.) All objections are overruled.

For a motion for summary judgment, "a party does not necessarily have to produce evidence in a form that would be admissible at trial." *Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001). "Rule 56[(c)] requires only that evidence '*would* be admissible', not that it presently *be* admissible." *Burch v. Regents of Univ. of Cal.*, 433 F. Supp. 2d 1110, 1120 (E.D. Cal. 2006). Thus, "[t]he focus is on the admissibility of the evidence's contents, not its form." *Estate of Hernandez-Rojas ex rel. Hernandez v. United States*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014) (citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004)); *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003)). And while a court will consider a party's evidentiary objections to a motion for summary judgment, "[o]bjections such as lack of foundation, speculation, hearsay[,] and relevance are duplicative of the summary judgment standard itself." *All Star Seed v. Nationwide Agribusiness Ins. Co.*, No. 12-cv-00146-L-BLM, 2014 WL 1286561, at *16 (S.D. Cal. Mar. 31, 2014) (citing *Burch*, 433 F. Supp. 2d at 1119–20).

The Hipschmans raise primarily relevance, lack of foundation, speculation/lack of personal knowledge, and hearsay objections. (Doc. No. 175 at 43–44.) These objections are overruled. *See All Star Seed*, 2014 WL 1286561, at *16. The Hipschmans also object

37

to certain paragraphs in the Declaration of Jeffrey K. Miyamoto (Doc. Nos. 163-4; 164-4) and the Declaration of Maria Araiza (Greer) (Doc. Nos. 163-6; 164-6) as improper arguments and vague. (Doc. No. 175 at 43–44.) Insofar as the Court's decision does not depend on the statements made in those paragraphs, the Court declines to reach these remaining evidentiary objections.

Meanwhile, Defendants object to portions of the transcript of the March 27, 2024 deposition of Carolina Hipschman (Doc. No. 191 at 12–13) as hearsay and for lack of personal knowledge. (Doc. No. 186-1 at 2.) Defendants' objections do not comply with this Court's Civil Case Procedures, which require objections to "be set forth in the parties' opposition or reply. Separate statements of objections will NOT be allowed. The inclusion of objections does not expand the page limits set." J. Battaglia Civ. Case Proc. § III.B. Defendants submitted their objection as a separate statement of objection and also used the entirety of the ten-page limit for their reply brief. (*See* Doc. Nos. 171 at 2; 186; 186-1.) Accordingly, the Court does not consider Defendants' objections.

In short, the Court **OVERRULES** the Hipschmans' evidentiary objections (Doc. No. 175 at 43–44) and declines to consider Defendants' evidentiary objections (Doc. No. 186-1).

### B.     Motions for Summary Judgment

#### 1.     Claim 1 – Unlawful removal

The Ninth Circuit has established that

[o]fficials may remove a child from the custody of its parent without prior judicial authorization only if the information they possess at the time of the seizure is such as provides reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury.

*Wallis v. Spencer*, 202 F.3d 1126, 1138 (9th Cir. 2000). A threat is "imminent" "when officials have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." *Demaree v. Pederson*, 887 F.3d 870, 878 (9th Cir. 2018) (citing *Kirkpatrick v. County of Washoe*, 843 F.3d 784,

790 (9th Cir. 2016)). Warrantless removals are unlawful "unless reasonable avenues of investigation are first pursued, particularly where it is not clear that a crime has been—or will be—committed." *Wallis*, 202 F.3d at 1138. "The existence of reasonable cause, and the related questions, are all questions of fact to be determined by the jury." *Id.*

> Summary judgment in favor of Defendants is improper
>
> if a material question of fact exists regarding whether (1) there was reasonable cause to believe, on the basis of the information in the possession of the [Defendants], that [C.H.] faced an immediate threat of serious physical injury or death; or (2) the actions taken by [Defendants]—removing [C.H.] from [the Hipschmans' custody]—exceeded the permissible scope of the action necessary to protect [C.H.] from that immediate threat.

*Id.*

When assessing a defendant's claim of qualified immunity, "summary judgment is improper if, resolving all disputes of fact and credibility in favor the party asserting the injury, (1) the facts adduced show that the officer's conduct violated a constitutional right, and (2) that right was 'clearly established' at the time of the violation." *Kirkpatrick*, 843 F.3d at 788 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). A government official is entitled to qualified immunity "unless the law at the time of the [alleged violation] clearly established the unconstitutionality of [the official's] conduct." *Id.*

Here, the Court concludes that material questions of fact exist regarding whether (1) there was reasonable cause to believe that C.H. faced an immediate threat of serious physical injury, (2) Defendants pursued reasonable avenues of investigation, and (3) removing C.H. exceeded the scope of action needed to protect C.H. Nevertheless, Defendants are entitled to qualified immunity because the law regarding exigent removals to prevent neglect has not been clearly established.[8]

---

[8] Because the Court concludes that Individual Defendants are entitled to qualified immunity on Claim 1, the Court declines to address the issue of which specific Individual Defendant(s) may have been responsible for C.H.'s removal. (*See* Doc. Nos. 164-1 at 15–16, 20–21; 175 at 24–25.)

**a.     Defendants may have had reasonable cause to believe that C.H. faced an immediate threat of serious physical injury.**

As a preliminary matter, in assessing whether exigent circumstances may have justified Defendants' warrantless removal of C.H., the Court notes that its initial inquiry considers whether Defendants possessed "reasonable cause to believe that [C.H.] [was] in imminent danger of serious bodily injury." *Wallis*, 202 F.3d at 1138. This is a broader inquiry than the Hipschmans' proposal that the Court focus on whether "there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse." (Doc. No. 167-1 at 16 (quoting *Wallis*, 202 F.3d at 1138) (emphasis omitted); *see also* Doc. No. 175 at 11 ("Defendants must direct the Court to 'specific, articulable evidence' that provides 'cogent, fact-focused reasonable cause to believe C.H. would be imminently subject to physical abuse.'").) The broader inquiry is crucial insofar as Ninth Circuit precedent makes clear that Defendants are not limited to acting to protect children in situations where there is intentional abuse. *See, e.g.*, *Wallis*, 202 F.3d at 1138 ("the police cannot seize children suspected of being abused *or neglected* unless reasonable avenues of investigation are first pursued") (emphasis added). That the caselaw predominantly addresses the issue of intentional abuse merely reflects the facts underlying the Ninth Circuit's decisions. *Compare, e.g.*, *Demaree*, 887 F.3d at 874–75 (alleged sexual abuse); *Burke v. County of Alameda*, 586 F.3d 725, 729–30 (9th Cir. 2009) (alleged sexual and physical abuse); *Mabe v. San Bernardino County, Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1104–05 (9th Cir. 2001) (alleged sexual abuse); *Wallis*, 202 F.3d at 1131–35 (alleged sexual and physical abuse); *Ram v. Rubin*, 118 F.3d 1306, 1309 (9th Cir. 1997) (alleged sexual abuse); *with Kirkpatrick*, 843 F.3d at 786–88 (alleged neglect); *Rogers v. County of San Joaquin*, 487 F.3d 1288, 1291–94 (9th Cir. 2007) (alleged neglect).

### i.     Serious physical injury from abuse

Beginning with the issue of injury from abuse, there is no evidence that C.H. was at risk of suffering serious bodily injury from intentional abuse.

22-cv-00903-AJB-BLM

The Hipschmans assert that Defendants' removal of C.H. from Carolina and Alexander's custody was unlawful because there were no exigent circumstances showing "that Alexander or Carolina either (1) had caused C.H.'s injury or (2) posed a threat to injure C.H. in the future." (Doc. No. 167-1 at 18 (emphasis omitted).) Specifically, the Hipschmans point out that medical professionals could not identify whether C.H.'s injury "was caused by an accident or was nonaccidental" and that Defendants had no evidence that Carolina or Alexander injured C.H. or would injure C.H. in the future. (*Id.* at 17–18.)

In contrast, Defendants assert that they reasonably believed exigent circumstances were present because

> C.H. was only seven months old, preverbal, had a skull fracture that none of his caregivers could account for, and about which two Rady child abuse specialists opined resulted from force to the head that was plausibly non-accidental, and was scheduled to be discharged that very day back into the environment where he had incurred that injury.

(Doc. No. 164-1 at 16–17.)

The Hipschmans have the better argument here. When basing a removal on allegations of abuse, the "state may not remove children from their parents' custody without a court order unless there is specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse." *Wallis*, 202 F.3d at 1138.

Defendants did not have "specific, articulable evidence" that C.H. was abused, much less that C.H. was at imminent risk of being abused again. At best, Defendants had evidence that C.H. *may have* been abused based on Dr. Vega's observation that, "[i]n the absence of a plausible explanation, this injury is highly concerning for non-accidental trauma." (Doc. No. 189 at 187.)[9] Nevertheless, Dr. Suresh explained that C.H.'s injury "was not

---

[9] The Hipschmans make much of the fact that the consultation note that Defendants received on June 26, 2020, was "non-final" and "incomplete" because it was not signed by an attending physician. (*See, e.g.*, Doc. No. 167-1 at 22.) However, the Hipschmans do not point to any legal basis that required Defendants to disregard the information contained in the consultation note. (*See generally* Doc. Nos. 167-1; 175.) Nor do the Hipschmans point to any legal basis that prevents the Court from considering the information contained in the consultation note. (*See generally* Doc. Nos. 167-1; 175.) Tellingly, it appears

22-cv-00903-AJB-BLM

necessarily an abusive type injury" and that medical staff "could not determine the cause of the injury." (Doc. No. 189 at 61; *see also id.* at 13.) Consistent with the medical staff's inability to identify a cause for C.H.'s injury, Defendants concede that they "did not have any evidence that Alexander Hipschman had intentionally injured C.H. at the time of C.H.'s removal" and that they "did not have any evidence that Carolina Hipschman had intentionally injured C.H. at the time of C.H.'s removal." (Doc. No. 167-3 at 12, 25–26.)

Defendants' actions also belie any implication that C.H. was at imminent risk of being abused by Carolina or Alexander. An "official's prior willingness to leave [a] child[] in [its] home militates against a finding of exigency." *Rogers*, 487 F.3d at 1295. This is because leaving a child in the care of his suspected abuser "raises a serious question about [the social worker's] belief that [the child] was in imminent danger." *Mabe*, 237 F.3d at 1108. This is particularly so when the alleged abuse is something like a physical beating, which "could happen at any time of the day." *Id.* Under such circumstances, leaving an abused child with his abuser to obtain a court order creates an opportunity for the abuser to "abuse the child again or flee with him." *White v. Pierce County*, 797 F.2d 812, 815–16 (9th Cir. 1986). Here, Romero left C.H. in the Hipschmans' care on the night of June 26. (Doc. No. 167-3 at 10, 24–25.) If Defendants were concerned that either Carolina or Alexander had abused C.H. and would abuse C.H. again imminently, it stands to reason that Defendants would have removed C.H. immediately. *See White*, 797 F.2d at 815–16.

---

that despite their objections to Dr. Vega's consultation note, the Hipschmans still insist that Defendants should have consulted Dr. Vega to obtain her opinion. (*See, e.g.*, Doc. No. 167-1 at 23 ("Indeed, Dr. Vega – the consult note author – should have been one of the first people Romero contacted").)

Moreover, the evidence indicates that an attending physician approved the consultation note with the added clarification that "[i]n young infants who require constant supervision, the lack of an explanatory trauma history is worrisome at the very least for neglectful supervision." (Doc. No. 190 at 265.) To the extent that the attending physician included additional clarifications, no party has provided the Court with the final consultation note.

Under these circumstances, the Court cannot fault Defendants for considering and relying upon the information that they were able to gather.

22-cv-00903-AJB-BLM

Given this evidence, no rational jury could conclude that Defendants had reasonable cause to believe that C.H. faced a risk of serious bodily injury from abuse by the Hipschmans. *See Wallis*, 202 F.3d at 1138. Such non-existent risk is, correspondingly, not imminent.

### ii.    Serious physical injury from neglect

The issue of injury from neglect, however, leads to a different conclusion. Defendants may have had reasonable cause to believe that C.H. was at serious risk of suffering serious bodily injury due to neglect in the time it would have taken Defendants to obtain a warrant.

Both Defendants and medical staff were concerned that C.H.'s injury may have resulted from the Hipschmans' neglect. For instance, Dr. Vega explained that medical staff had a "concern . . . for either physical abuse or neglectful supervision." (Doc. No. 164-2 at 90.) Defendants similarly noted that C.H.'s injury was "of such nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omissions of the parent[s]." (Doc. No. 189 at 89.) Defendants thus note that they "possessed information suggesting that C.H. had *already* been subjected to either abuse or neglect in his home, which resulted in a skull fracture that no one could explain." (Doc. No. 164-1 at 18.)

The evidence in Defendants' possession at the time C.H. was removed is consistent with C.H.'s injury being sustained because of neglectful supervision. Dr. Vega indicated that "[i]n a young infant who requires constant supervision, the event leading to this severe injury would have been readily apparent to any prudent caregiver." (Doc. No. 189 at 187.) Yet when Defendants asked the Hipschmans how C.H. might have sustained his injury, Carolina and Alexander indicated that they were not certain how the injury occurred. (*See* Doc Nos. 163-2 at 22; 189 at 10; *see also* Doc. No. 189 at 58–59.) The Hipschmans' identification of several instances where C.H. hit his head did not preclude a possibility of neglect.

43

Additionally, Defendants could have reasonably considered C.H.'s injury to constitute "serious bodily harm." Again, Dr. Vega indicated that "C.H." had suffered a "severe injury." (Doc. No. 189 at 187.)[10]

It was also reasonable for Defendants to believe that a recurring injury would be imminent upon C.H.'s discharge from the hospital. As an initial matter, Defendants' decision to leave C.H. with the Hipschmans in a hospital setting does not preclude a finding of exigency. The Ninth Circuit stated in *Rogers* that "an official's prior willingness to leave the children *in their home* militates against a finding of exigency." 487 F.3d at 1295 (citing *Mabe*, 237 F.3d at 1108) (emphasis added). Here, Defendants left C.H. with the Hipschmans in a hospital, not their home—*i.e.*, "the environment in which his injuries [were sustained]." (Doc. No. 189 at 187; *see also* Doc. No. 163-2 at 84–85 (explaining typographical error).) This distinction is crucial because social workers may consider a hospital setting "where nurses [are] supervising all of [a child's] medical needs" a "safe environment." *Kirkpatrick*, 843 F.3d at 791–92. That does not mean, however, that C.H. would not face an imminent threat once he was discharged. *See id.* at 797–98 (Christen, J., concurring); 801 (Kozinski, J., dissenting).

Any potential recurring injury also could have occurred in the time it would have taken Defendants to obtain a warrant. Dr. Vega explained that "[i]f [C.H.] were to be returned to the environment in which his injuries [were sustained], it would place him at high risk of further maltreatment." (Doc. No. 189 at 187; *see also* Doc. No. 163-2 at 84–85.) Here, the evidence shows that C.H. was cleared for discharge from the hospital around noon on Saturday, June 27. (*See* Doc. No. 189 at 61.) However, Defendants could not obtain a warrant for C.H.'s removal until Monday, June 29, 2020, at the earliest. (*See* Doc. No. 191 at 61.)[11] Under these circumstances, it is plausible that C.H. could have suffered

---

[10]    This categorization is supported by Dr. Plonsker's subsequent acknowledgement that one "could also argue that any bleeding in the brain or on the brain is a serious injury." (Doc. No. 190 at 157.)

[11]    The Hipschmans assert that "County social workers can obtain court orders after hours and on weekends." (Doc. No. 175 at 16–17 (citing Doc. No. 175-2 at 10–11).) However, the cited document does

22-cv-00903-AJB-BLM

an additional severe injury in the approximately day and a half between C.H.'s discharge and when Defendants would have obtained a warrant for C.H.'s removal.

In light of the foregoing, a rational jury could conclude that Defendants had reasonable cause to believe that C.H. faced a risk of serious bodily injury from neglect by the Hipschmans, and that such risk was imminent. *See Wallis*, 202 F.3d at 1138.

### b. Defendants may have pursued all reasonable avenues of investigation.

In seeking summary judgment, the Hipschmans assert that "Defendants failed to pursue reasonable avenues of investigation" because they removed C.H. "*before* the investigation was completed." (Doc. No. 167-1 at 21.) In particular, the Hipschmans insist that Romero should have interviewed Dr. Plonsker, Dr. Vega, Dr. Nienow, Frank, Emma, or M.H. before removing C.H. (*Id.*)

Defendants respond that no precedent explains what constitutes a reasonable investigation, and so Defendants did not violate any "clearly established" law regarding investigations. (Doc. No. 172 at 16–17.)

Both parties are incorrect. Preliminarily, the Hipschmans do not point to any caselaw requiring officials to "complete" an investigation before removing a child. (*See generally* Doc. Nos. 167-1 at 21–24; 175 at 19–20.) Instead, Ninth Circuit precedent requires officials to first pursue "reasonable avenues of investigation." *Wallis*, 202 F.3d at 1138. "Whether a reasonable avenue of investigation exists, however, depends in part upon the time element and the nature of the allegations." *Id.*

The Hipschmans make no effort to show that any additional "reasonable avenue[s] of investigation exist[ed]" for Romero. (*See* Doc. Nos. 167-1 at 21–24; 175 at 19–20.)

---

not address warrants for removal. (*See* Doc. No. 175-2 at 8 ("Medical Treatment/Medical Releases"), 11 (discussing "Order on Petition for Medical, Dental, Mental Health and/or other Remedial Care").) Additionally, the Hipschmans' reliance on the juvenile court's 2025 rules (Doc. No. 175 at 17 (quoting Doc. No. 175-2 at 26)), is misplaced given that the quoted language appears be from a 2022 revision, *i.e.*, after the underlying events occurred. (Doc. No. 175-2 at 26.)

22-cv-00903-AJB-BLM

Instead, the Hipschmans assume that such avenues existed and baldly assert that Romero "refus[ed]" to contact Dr. Plonsker, Dr. Nienow, Dr. Vega, and M.H. (*Id.* at 22–24.)

The record casts doubt on the Hipschmans' assumption. Romero had less than a day to conduct an investigation before Defendants had to decide whether to remove C.H. The matter was referred to Defendants shortly before 5:00 p.m. on Friday, June 26. (Doc. No. 189 at 2.) C.H. would have been discharged around noon the following day. (*Id.* at 61.) The evidence indicates that Dr. Nienow and Dr. Vega were not available to talk with Romero, though it is not clear why. (*See* Doc. No. 190 at 179–81.) Thus, interviews with Dr. Nienow and Dr. Vega may not have constituted "reasonable avenue[s] of investigation" before C.H. was discharged. *See Wallis*, 202 F.3d at 1138.[12]

In the meantime, Romero stayed at the hospital investigating the matter past 9:00 p.m. on June 26 and resumed working on the matter by 9:00 a.m. on June 27. (*See* Doc. No. 189 at 9, 13.) Before Defendants placed the hospital hold on C.H., Romero interviewed or spoke with at least Carolina, Alexander, Dr. Suresh, Officer Anderson, Agent Fisher, Detective Murgia, and Detective Salazar. (*Id.* at 5–15.) Romero also reviewed Dr. Vega's consultation note and attempted to talk with the reporting party and the hospital social worker. (Doc. Nos. 163-2 at 53–56; 189 at 6, 8.)

Given this evidence, a rational jury may conclude that Romero pursued all "reasonable avenue[s] of investigation" during the roughly 19 hours Romero had to investigate.

---

[12] The evidence indicates that at least one of the hospital staff members who initially worked on the matter had already left for the day when Romero began her investigation. (Doc. No. 189 at 8.) Taking into consideration that Romero started her investigation on a Friday afternoon, it is plausible that Dr. Plonsker, Dr. Nienow, and Dr. Vega had also left for the weekend by the time Romero began investigating and that Romero consequently was not able to interview any of the doctors.

22-cv-00903-AJB-BLM

**c.**      **It is not clear whether the removal of C.H. exceeded the scope of action needed to protect C.H.**

The Hipschmans next claim that Defendants "failed to consider lesser intrusive alternative means" and, in particular, "did not even attempt to explore a safety plan that would obviate the need to seize C.H." (Doc. No. 167-1 at 25.) In making this claim, the Hipschmans contend that Defendants should have "explore[d] a safety plan where the parents and child *together* leave the home – where the injury occurred – as opposed to seizing the child." (*Id.*)

Insofar as Defendants lacked specific, articulable evidence that C.H. sustained his injury through intentional abuse, the Court agrees that removing C.H. from the Hipschmans' custody exceeded the scope of action needed to protect C.H. from intentional abuse. (*See supra* at 40–43.)

Nevertheless, neither the Hipschmans nor Defendants address the question of what level of intrusion is reasonable for averting an imminent serious injury that is due to neglect. (*See generally* Doc. Nos. 164; 167-1; 172; 175; 186.)

It is consequently not clear whether Defendants could have pursued a less intrusive remedy to protect C.H.

**d.**      **The Ninth Circuit has not explained when the warrantless removal of an infant to prevent neglect violates the Constitution.**

It is "well-settled that a child could not be removed without prior judicial authorization absent evidence that the child was in imminent danger of serious bodily injury." *Kirkpatrick*, 843 F.3d at 792. However, the Ninth Circuit has indicated that this rule is articulated "at a high level of generality" and does not clearly define what factors would "support a finding of exigency." *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)). In fact, the Ninth Circuit acknowledges that none of its cases "explain when removing an infant from a parent's custody at a hospital to prevent neglect, without a warrant, cross the line of reasonableness and violates the [Constitution]." *Id.*

22-cv-00903-AJB-BLM

In asserting that Defendants are not entitled to qualified immunity on Claim 1, the Hipschmans do not point to any more recent precedent that provides any such explanation. (*See* Doc. Nos. 167-1 at 29; 175 at 35–38.) The Hipschmans instead point to *Reynolds v. County of San Diego*, 224 F. Supp. 3d 1034 (S.D. Cal. 2016), and *Swartwood v. County of San Diego*, 84 F. Supp. 3d 1093 (S.D. Cal. 2014), to assert that the law regarding exigent removals has been clearly established. (Doc. No. 175 at 38.) The Hipschmans' reliance on these cases is misplaced. Notably, the Ninth Circuit decided *Kirkpatrick* on December 9, 2016. 843 F.3d 784. *Reynolds* and *Swartwood* both pre-date *Kirkpatrick*, and were published on October 3, 2016, and September 30, 2014, respectively. 224 F. Supp. 3d 1034; 84 F. Supp. 3d 1093. Under these circumstances, the Hipschmans do not demonstrate that the law regarding when government officials may effectuate a warrantless removal of an infant to prevent neglect has become "clearly established" since *Kirkpatrick*.

Moreover, *Swartwood* is distinguishable and *Reynolds* militates in favor of a finding of qualified immunity. In assessing whether the *Swartwood* defendants were entitled to qualified immunity, the court largely relied on the proscription that "a parent . . . could not be summarily deprived of that custody without notice and a hearing, except when the children were in imminent danger." 84 F. Supp. 3d 1093, 1111 (quoting *Ram*, 118 F.3d at 1310). This is precisely the "high level of generality" that the Ninth Circuit cautioned against in *Kirkpatrick*. 843 F.3d at 792 (quoting *al-Kidd*, 563 U.S. at 742). Furthermore, the *Swartwood* court determined that no exigency existed because there was no evidence that the children "were in imminent danger of serious bodily injury from" the parents. 84 F. Supp. 3d at 1107. Here, however, Defendants may have had reasonable cause to believe that C.H. was in imminent danger of serious bodily injury from the Hipschmans. (*Supra* at 43–45.) Thus, this case is more like *Kirkpatrick*, where "it was not beyond debate that the confluence of factors [at issue] would not support a finding of exigency." 843 F.3d at 793.

Meanwhile, the *Reynolds* court found that the defendants in that case were entitled to qualified immunity. 224 F. Supp. 3d at 1052. There, the defendants asserted that the removal of six-week-old R.R. was justified because R.R. had an unexplained fractured

femur and R.R.'s parents "could not be ruled out as the suspected abuser because either parent could have caused R.R.'s injury, or at the very least, [may have been] shielding the true abuser from responsibility." *Id.* at 1051. Thus, the court determined that the defendants could have reasonably believed exigent circumstances justified the removal and were accordingly entitled to qualified immunity. *Id.* at 1052. These facts align with the facts before Defendants at the time C.H. was removed. (*Supra* at 5–16.)

Furthermore, the Court has not been able to find any precedent that "explain[s] when removing an infant from a parent's custody at a hospital to prevent neglect, without a warrant, cross the line of reasonableness and violates the [Constitution]." *Kirkpatrick*, 843 F.3d at 793. *Rogers* and *Kirkpatrick* do not provide clear guidance. In *Rogers*, the Ninth Circuit affirmed that bottle rot, malnourishment, and disorderly conditions in a home did not present a serious risk of bodily harm to a three-year-old and a five-year-old child. 487 F.3d at 1291, 1295. The *Rogers* court added that the "very low" chances of an "accidental injury or of a fire breaking out" "during the few hours that it would take . . . to obtain a warrant" did not "establish reasonable cause to believe that . . . children were in immediate danger." *Id.* at 1295. In contrast, *Kirkpatrick* recognized that the fact that a newborn infant "could die if she goes home with a mother who's high on drugs and forgets to feed her" could be sufficient for a jury to conclude that there was an imminent danger of serious bodily injury. 843 F.3d at 791–92.

The facts of this case fall somewhere within the spectrum produced by *Rogers* and *Kirkpatrick*. On the one hand, the chances of C.H. suffering an accidental injury in the day and a half between C.H.'s discharge and when Defendants could obtain a warrant were likely "very low," as was the case in *Rogers*. 487 F.3d at 1295. On the other, Dr. Vega indicated that C.H. faced a threat of a "severe injury"—as opposed to any mere accidental injury—and C.H. was seven months old, much younger than the children in *Rogers*. (Doc. No. 189 at 187.) This brings the facts of this case closer to *Kirkpatrick*. *See* 843 F.3d at 791–92.

22-cv-00903-AJB-BLM

Without further clarifying precedent, the Court must conclude that "[n]o matter how carefully a reasonable social worker had read [the Ninth Circuit's] case law, she could not have known that seizing [C.H.] would violate federal constitutional law. Without that fair notice, the social workers in this case are entitled to qualified immunity." *Id.* at 793.

*    *    *

In light of the foregoing, the Hipschmans are not entitled to summary judgment on Claim 1 because exigent circumstances may have justified Defendants' removal of C.H. from the Hipschmans' custody. However, Defendants are protected by qualified immunity against Claim 1 and, in turn, are entitled to summary judgment as a matter of law.

### 2.    Claim 2 – Deprivation of notice, consent, presence

The right to family association "includes the right of parents to make important medical decisions for their children" as well as the right "to be with their children while they are receiving medical attention (or to be in a . . . nearby area if there is a valid reason for excluding them . . . )." *Wallis*, 202 F.3d at 1141–42. To protect these rights, "the County is required to: (1) notify the parents of a medical examination of their children; (2) obtain parental consent or a court order in advance of the medical examination; and (3) permit the parent to be present at the examination." *Benavidez v. County of San Diego*, 993 F.3d 1134, 1150 (9th Cir. 2021) (citing *Mann v. County of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018)).

Claim 2 implicates each of these three requirements for three events identified by the Hipschmans: (1) Samuels' examination of scratches near C.H.'s groin; (2) the skeletal survey; and (3) the general examination. (*See* Doc. No. 72 ¶ 212.)

### a.    Samuels' examination of scratches near C.H.'s groin

The Court denies summary judgment to the Hipschmans and to Defendants on Claim 2 as it pertains to Samuels' examination of scratches near C.H.'s groin because no party has presented a cogent or timely argument on the issue. Courts "review only issues which are argued specifically and distinctly in a party's . . . brief[s]. We will not manufacture arguments . . . and a bare assertion does not preserve a claim, particularly when, as here, a

host of other issues are presented for review." *Brownfield v. City of Yakima*, 612 F.3d 1140, 1149 n.4 (9th Cir. 2010) (quoting *Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994)). Parties' failure to brief an issue means that the issue "is too undeveloped to be capable of assessment." *Hibbs v. Dep't of Human Res.*, 273 F.3d 844, 873 n.34 (9th Cir. 2001), 538 U.S. 721 (2003). "Arguments raised for the first time in a reply brief are waived." *Autotel v. Nevada Bell Tel. Co.*, 697 F.3d 846, 852 n.3 (9th Cir. 2012) (quoting *Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012)).

Here, neither the Hipschmans nor Defendants mention the scratches or Samuels' examination of the scratches in their initial arguments on Claim 2. (*See* Doc. Nos. 164-1 at 21–23; 167-1 at 26–29.) In fact, the only time Samuels' examination of the scratches is addressed is in two passing sentences in the Hipschmans' reply brief. (Doc. No. 175 at 30.) The parties have nevertheless presented numerous other related issues for the Court's consideration. (*See, e.g.*, Doc. Nos. 164-1 at 21–23; 167-1 at 26–29.) Given the circumstances, the Court cannot assess such undeveloped—really nonexistent— arguments. *Hibbs*, 273 F.3d at 873. The Court also will not address the Hipschmans' waived and underdeveloped reply brief argument. *Autotel*, 697 F.3d at 852 n.3.

### b.    Skeletal survey

Turning to the skeletal survey, Defendants provided adequate notice of the medical examination to the Hipschmans, but deprived the Hipschmans of their right to consent to the examination. There is no dispute that Carolina attended the skeletal survey, so there was no violation of Carolina's right to be present. (Doc. Nos. 163-2 at 43; 190 at 462.)

### i.    Right to Notice

Beginning with whether Defendants provided adequate notice, the Hipschmans claim that "[t]o satisfy the 'notice' requirement, there must also be 'an opportunity to be heard.'" (Doc. No. 167-1 at 26 (citing *Wallis*, 202 F.3d at 1141; *Mann*, 907 F.3d at 1161).) With this framing, the Hipschmans assert that Defendants violated their right to notice. The Hipschmans are incorrect.

22-cv-00903-AJB-BLM

Preliminarily, the Hipschmans conflate their right to notice with the procedures for obtaining a court order. *Wallis* explained that,

> in the absence of parental consent, [physical examinations] of [a] child may not be undertaken for investigative purposes at the behest of state officials unless a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all circumstances.

202 F.3d at 1141 (emphasis added) (quoting *van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 867 (2d Cir. 1990)). The prefatory framing clarifies that the discussion regarding "an opportunity to be heard" applies to court order proceedings, not the initial notice. This is also confirmed by the placement of "upon notice to the parents, and an opportunity to be heard" within the parameters of what must be done before the *judicial officer* makes a determination.

With that clarification, the Court considers simply whether Samuels informed the Hipschmans of the skeletal survey to determine whether Samuels complied with the Hipschmans' right to notice.

The evidence shows that she did. In a July 7, 2020 email, Alexander wrote to Samuels, "[f]urthermore [social worker] Samuels barely confirmed that [C.H.] has a follow up appt on 7/9 at 10 and 11:30 on Thursday, July 2 at 5:50PM." (Doc. No. 189 at 38.) In other words, on July 2, Samuels notified the Hipschmans of two July 9 examinations. (*See id.*) The Hipschmans quibble that "Samuels did not provide *sufficient* notice – to allow an opportunity to be heard." (Doc. No. 167-1 at 27 (emphasis added).) But this contention concedes that Samuels provided *some* notice to assert that she should have provided *more*. Even then, the Hipschmans indicate that they did receive more, *e.g.*, "an opportunity to be heard," because "Carolina repeatedly and strenuously objected to . . . [s]keletal [s]urvey." (*Id.*)

The Hipschmans next argue that it was the foster caretaker who "told Carolina that C.H. had an examination and X-Ray appointment at Rady's hospital" and that "Samuels did *not* tell Alexander or Carolina about C.H.'s medical examinations." (Doc. Nos. 167-1

22-cv-00903-AJB-BLM

at 27 (citing Doc. No. 190 at 459, 461–62, 484–86, 488); 175 at 28 (same).) However, the cited evidence does not show that Samuels did not inform Alexander or Carolina about the medical examinations. (*See* Doc. No. 190 at 459, 461–62, 484–86, 488.) In fact, it shows the opposite—it was Samuels, not the foster caretaker, who told Carolina that the skeletal survey was ordered. (*Id.* at 461–62 ("He has to go to radiology department for a full-body scan, and he has to have a follow-up visit at the Chadwick Center with a specialist.").)

Given the Hipschmans' tacit concession and the corroborating evidence that Samuels provided some notice, the apparent implication of the Hipschmans' argument is that a social worker must be the first party to notify parents of upcoming examinations to satisfy the notice requirement. This implication is untenable in modern society, where automated systems can send appointment confirmation emails the moment an appointment is created and before a social worker has an opportunity to contact parents. It also disregards the reality that individuals can receive notice by multiple means, as the Hipschmans did here.

### ii.    Right to Consent

On the issue of consent, the undisputed evidence shows that Defendants lacked parental consent for the skeletal survey. Defendants point to the signed consent form as evidence that the Hipschmans consented to all medical procedures for C.H. while C.H. was in Defendants' custody. (Doc. No. 164-1 at 22.) However, Defendants concede that parents can revoke their consent after signing the consent form. (Doc. No. 191 at 150.) The evidence shows that Carolina withdrew her consent by objecting to the skeletal survey to Samuels. (Doc. No. 190 at 462.) Defendants do not point to any evidence to the contrary. Under these circumstances, no reasonable social worker could have believed that they had parental consent to move forward with the skeletal survey at that time.

*    *    *

In sum, Defendants are entitled to summary judgment on Claim 2 as it pertains the right to notice for the skeletal survey, while the Hipschmans are entitled to summary judgment on Claim 2 as it pertains to the right to consent to the skeletal survey.

22-cv-00903-AJB-BLM

### c.    General examination

On the general examination, Defendants also provided adequate notice of the medical examination to the Hipschmans. Issues remain, however, regarding whether Defendants were entitled to rely on the consent form and why Carolina may have been excluded from the examination.

### i.    Right to Notice

The evidence shows that Samuels notified the Hipschmans of the general examination when she notified them of the skeletal survey. (Doc. Nos. 189 at 38; 190 at 461–62.) This notice was sufficient for the reasons provided above. (*Supra* at 51–53.)

### ii.    Right to Consent

In contrast to the skeletal survey, whether Defendants violated the Hipschmans' right to consent to the general examination presents a much fuzzier image. As with the skeletal survey, Defendants first point to the signed consent form to show that Defendants were entitled to subject C.H. to a general examination. (Doc. No. 164-1 at 22.)

Unlike with the skeletal survey, there is no evidence in the record that Carolina withdrew her consent for the general examination. The Hipschmans assert that Carolina "repeatedly and strenuously objected to the examination and Skeletal Survey." (Doc. No. 167-1 at 27 (citing Doc. No. 190 at 462–63).) But the cited evidence does not address the general examination. The relevant line of questioning proceeded as follows:

> Q. Did you voice any objection to anyone about him having to undergo that scan?
> A. Yes.
> Q. Who did you tell?
> A. Elizabeth, several times.
> Q. That was in a phone call?
> A. In a phone call, in person, even that day.
> Q. Did you object to anybody else other than Elizabeth?
> A. No.

(Doc. No. 190 at 462–63.) Although the next line of questioning related to the general examination, it addressed whether Carolina was allowed to attend the general examination:

Q. Okay. Were you present for that exam?
A. No. Elizabeth told me I couldn't be present for that exam.

(*Id.* at 463.) Under these circumstances, any apparent authorization from the consent form was still in place for the general examination.

Thus, the Court turns to the issue of what, if anything, Carolina authorized by signing the consent form. The Hipschmans rely on *Pope v. County of San Diego*, 719 F. Supp. 3d 1076 (S.D. Cal. 2024), to assert that the consent form did not constitute a valid waiver of the Hipschmans' right to consent to medical examinations. (Doc. No. 167-1 at 28.)

The Court agrees with *Pope* that the consent form did not waive the Hipschmans' right to consent to the general examination. Nevertheless, *Pope* is not dispositive.

To waive a constitutional right, there must be an "intentional relinquishment or abandonment of a known right or privilege" that is "voluntary, knowing, and intelligent." *Barker v. Wingo*, 407 U.S. 514, 525 (1972) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *Gete v. INS*, 121 F.3d 1285, 1293 (9th Cir. 1997) (quoting *Davis v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394 (9th Cir. 1991)). For a waiver to be "knowing," an individual must be informed of the entitled privileges and understand the consequences of forfeiture. *See Pope*, 719 F. Supp. 3d at 1091–92 (citing cases).

Here, as Judge Ohta explained, the consent form[13] does not

> inform parents that they have the fundamental right to give or withhold consent for their child[]'s non-emergency care while their child[] [is] in temporary protective custody. Nor [does] it inform parents that they have the right to give or decline consent based on the specific treatment suggested for their child rather than merely providing wholesale consent for all medical treatment.

---

[13] The consent form at issue here is not identical to the consent form at issue in *Pope*. Rather, it appears that the form in *Pope* was a February 2015 version of the County's "CONSENT FOR EXAMINATION AND TREATMENT" form and that the form at issue here is a June 2020 version of the form. (*Compare* Doc. No. 190 at 520, *with* Doc. No. 189 at 64.) Nevertheless, the forms are not materially different. The only apparent differences between the forms are that the June 2020 form adds a "Covid-19 (Novel Coronavirus) testing" bullet to the second paragraph and notes that intake medical examinations "will occur within 7 calendar days of intake." (*Compare* Doc. No. 190 at 520, *with* Doc. No. 189 at 64.)

22-cv-00903-AJB-BLM

*Pope*, 719 F. Supp. 3d at 1093–94 (citing *Crespin v. Ryan*, 46 F.4th 803, 809 (9th Cir. 2022)). Thus, "[w]ithout explicitly advising parents of their constitutional right to consent to any medical treatment offered to their child and that signing the Consent Form would surrender that right, the Consent Form alone did not constitute a valid waiver of this liberty interest." *Id.* at 1094.

Defendants notably make no effort to defend the validity of any waiver of the right to consent to medical examinations effectuated through the consent form. (*See generally* Doc. Nos. 164-1 at 21–23; 172 at 18–19; 186 at 4–5.) Instead, Defendants argue that "no 'clearly established' law dictated that Samuels' conduct violated [the Hipschmans'] constitutional right to familial association." (Doc. No. 164-1 at 23; *see also* Doc. Nos. 164-1 at 21–23; 172 at 18–19; 186 at 4–5.)

Defendants raise a valid point. Whether Defendants are entitled to qualified immunity for failing to obtain the Hipschmans' consent for the general examination "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established *at the time* [the action] was taken.'" *Pearson v. Callahan*, 555 U.S. 223, 244 (2009) (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)) (emphasis added). As Defendants repeatedly note, *Pope* was not decided until 2024. (*See* Doc. Nos. 163-1 at 29; 164-1 at 23 n.15; 172 at 19; 186 at 5.) This Court consequently cannot rely on *Pope*, a "post-incident decision[], to determine whether the law was then clearly established." *Baker v. Racansky*, 887 F.2d 183, 187 (9th Cir. 1989). And the Hipschmans do not point to, nor can this Court identify, any pre-July 9, 2020 decisions explaining that Defendants' consent form did not constitute a valid waiver of consent for all medical examinations while a child is in Defendants' custody. (*See generally* Doc. Nos. 167-1 at 26–29; 175 at 28–30.)

The Hipschmans next contend that Carolina was coerced into signing the consent form as a way to invalidate any presumed consent. (Doc. No. 167-1 at 28.) Defendants respond that "such a theory is inapposite to Samuels' liability because [the Hipschmans]

22-cv-00903-AJB-BLM

neither allege in the [Second Amended Complaint] nor produce evidence now showing that Samuels had an [*sic*] knowledge of said concern." (Doc. No. 172 at 18 n.7.)

Defendants are partially correct. Officers will not be stripped of qualified immunity for relying on a warrant where the reliance is objectively reasonable. *Marks v. Clarke*, 102 F.3d 1012, 1028 (9th Cir. 1996) (citing *United States v. Leon*, 468 U.S. 897, 920–21 (1984)). However, the government "bears the burden of proving that its agents' reliance upon the warrant was objectively reasonable." *United States v. Michaelian*, 803 F.2d 1042, 1048 (1986) (citing *United States v. Hendricks*, 743 F.2d 653, 656 (9th Cir. 1984)).

Applying this framework, it is Defendants' burden to prove that Samuels' reliance on the consent form was objectively reasonable, not the Hipschmans' burden to prove the opposite. *See id.* Defendants have not set forth any evidence to carry this burden. (*See generally* Doc. Nos. 163-1; 164-1; 172; 186.) Absent such evidence, it is not clear that Samuels' reliance on the consent form was objectively reasonable such that she is entitled to qualified immunity. *See Michaelian*, 803 F.2d at 1048. In turn, Defendants are not entitled to summary judgment on Claim 2 as it pertains to the Hipschmans' right to consent to the general examination.

### iii.    Right to be Present

Turning to the Hipschmans' right to be present for the general examination, Defendants assert that they are entitled to qualified immunity because they received a juvenile court order that "vested [Defendants] with the discretion to allow Plaintiffs' presence." (Doc. No. 164-1 at 22.) Defendants add that "the evidence shows that . . . either one or both [of the Hipschmans] were present at each of the contested examinations." (*Id.*) Defendants further state that "[a]lthough Mrs. Hipschman was not permitted to physically enter the examination room during one of the appointments at Rady on July 9th, that was a result of *Rady*'s hospital policy, not of any decision or action by Samuels." (*Id.*)

Defendants are not entitled to qualified immunity based on the juvenile court order. Defendants point to a single sentence from the juvenile court's July 1, 2020 minute order to support the defense that Samuels had court authorization to exclude the Hipschmans

22-cv-00903-AJB-BLM

from the general examination. (*Id.*)[14] In that sentence, the juvenile "COURT AUTHORIZES PARENTS TO BE PRESENT AT MEDICAL APPOINTMENTS FOR THE MINOR." (Doc. No. 189 at 94.) Defendants interpret this sentence to mean that "the juvenile court vested [Defendants] with the discretion to allow Plaintiffs' presence— i.e., *authorized* it— but did not *mandate* it, as Plaintiffs claim." (Doc. No. 164-1 at 22.)

Defendants' interpretation defies any logical reading of the juvenile court order. The identified sentence does not address Defendants at all. (Doc. No. 189 at 94.) A logical leap is consequently necessary to reason that the sentence implicates Defendants' authority and vests Samuels with any sort of discretion over the Hipschmans' presence at medical appointments. That leap, however, leads straight into a wall. The juvenile court made clear that it knew how to vest Samuels with discretion, ordering that "SOCIAL WORKER HAS DISCRETION TO DETAIN MINOR WITH RELATIVES"; "[t]he social worker is given discretion to lift supervision of visits, allow overnight visits with parents with notice to minor's counsel"; and "[t]he social worker is given discretion to BEGIN A 60-DAY TRIAL VISIT with parents with CONCURRENCE OF minor's counsel." (*Id.*) Given these explicit investitures of discretion, Defendants' reading that the juvenile court order silently vested Samuels with any discretion over the Hipschmans' presence at medical examinations is unreasonable and does not entitle Samuels to qualified immunity.

Turning to the evidence, genuine issues of material fact preclude summary judgment on the presence requirement for the general examination. In particular, the Hipschmans contend that Carolina was excluded from the examination room because "Elizabeth [Samuels] told me I couldn't be present for that exam." (Doc. No. 175 at 29 (citing Doc. No. 190 at 463.).) Carolina added that Samuels was present at the hospital on July 9. (Doc. No. 190 at 463.) Carolina also asked "the front girl [*sic*] if [Carolina] could go in [the

---

[14]    Defendants cite "DNOL, Ex. 'CC' [7/1/20 Minute Order] at p.2." (*Id.*) However, the cited document appears to be a court-stamped copy of the detention report. (*See* Doc. No. 189 at 127–52.)

examination room], and she said that that's not a problem." (Doc. No. 175 at 29–30 (citing Doc. No. 190 at 462, 464).)

Nevertheless, at the time of general examination, Alexander conceded that hospital policy may have caused Carolina's exclusion. (Doc. No. 189 at 44.)

Moreover, Dr. Vega testified that during June and July of 2020, Rady "require[d] a lesser number of people be allowed in an examination room because of COVID precautions." (Doc. No. 163-2 at 92.) Dr. Vega additionally testified that in June 2024, Rady had a policy that "anyone who is suspected of maltreatment for a particular child cannot be present at that child's visit in person." (*Id.* at 91.) She did not know if the same policy was in place at the time of C.H.'s general examination. (*Id.* at 91–92.)

In turn, a genuine issue of material fact exists regarding why Carolina was excluded from the July 9, 2020 general examination.[15]

In sum, Defendants are not entitled to qualified immunity on the Hipschmans' right to be present during the July 9, 2020 general examination. However, a genuine issue of material fact precludes summary judgment on the issue.

### 3.   Claim 3 – Judicial deception

Ninth Circuit "caselaw clearly establishes that, as part of the right to familial association, parents and children have a 'right to be free from judicial deception' in child custody proceedings and removal orders." *David v. Kaulukukui*, 38 F.4th 792, 800 (9th Cir. 2022) (quoting *Greene v. Camreta*, 588 F.3d 1011, 1034 (9th Cir. 2009)). Judicial deception can take the form of either a "deliberate omission or affirmative misrepresentation." *Id.* at 801 n.3. "A statement can also be misleading if, although

---

[15]   There appears to be conflicting evidence on whether Carolina was excluded from the general examination. In asserting that she was excluded, Carolina testified that Samuels was present at the hospital on July 9, 2020, when Samuels excluded Carolina from the examination room. (Doc. No. 190 at 463.) However, Samuels testified that she did not "go to [the general] exam." (*Id.* at 486.) Additionally, the doctors' notes for C.H.'s general examination indicate that both Thomas and Carolina were present during the examination. (Doc. No. 189 at 97 ("Support person present during exam: paternal grandfather, mother"); *see also* Doc. No. 163-2 at 230.)

technically true, it has been so wrenched from its context that the judicial officer will not comprehend how it fits into the larger puzzle." *Scanlon v. County of Los Angeles*, 92 F.4th 781, 799 (9th Cir. 2024). Such is the case when an officer has "omitted facts required to prevent technically true statements in [an] affidavit from being misleading." *Ewing v. City of Stockton*, 588 F.3d 1218, 1224 (9th Cir. 2009).

"To state a violation of the constitutional right to familial association through judicial deception, a plaintiff must allege '(1) a misrepresentation or omission (2) made deliberately or with a reckless disregard for the truth, that was (3) material to the judicial decision.'" *David*, 38 F.4th at 801 (quoting *Benavidez*, 993 F.3d at 1147). "A misrepresentation or omission is 'material' if a court 'would have declined to issue the order had [the defendant] been truthful.'" *Id.* (quoting *Greene*, 588 F.3d at 1035) (alteration in original).

For a "judicial deception claim to survive summary judgment, [a plaintiff] 'must 1) make a substantial showing of [the defendants'] deliberate falsehood or reckless for the truth and 2) establish that, but for the dishonesty, the challenged action would not have occurred.'" *Chism v. Washington*, 661 F.3d 380, 386 (9th Cir. 2011) (quoting *Liston v. County of Riverside*, 120 F.3d 965, 973 (9th Cir. 1997)). "If a plaintiff satisfies these requirements, 'the matter should go to trial.'" *Butler v. Elle*, 281 F.3d 1014, 1024 (9th Cir. 2002) (quoting *Liston*, 120 F.3d at 972–75).

In the second amended complaint, the Hipschmans allege that Romero made a number of specific false statements in her notes. (*See* Doc. No. 72 ¶ 114.)

The Hipschmans contend that Samuels engaged in deception when she "attested . . . that C.H.'s injury 'is of such a nature as would ordinarily not be sustained except as the result of the unreasonable or neglectful acts or omission [*sic*] of the parent,' and 'there is substantial risk that the child will suffer serious physical harm.'" (Doc. No. 175 at 31 (quoting Doc. No. 189 at 89).) The Hipschmans also complain that Defendants "repeatedly report[ed] that Alexander and Carolina did not have a plausible explanation for C.H.'s injuries" and exaggerated the severity of C.H.'s injury. (*Id.* at 32–33.) Finally, the

22-cv-00903-AJB-BLM

Hipschmans insist that Defendants undermined the Hipschmans' credibility by discrediting and suppressing exculpatory information. (*Id.* at 33–34.)

These arguments are meritless.[16]

Preliminarily, the Court notes that the evidence regarding the incidents of which Romero was informed is inconsistent and presents a genuine issue of material fact. For example, Defendants and the Hipschmans both acknowledge Alexander's deposition testimony that Carolina told Romero about the M.H. Mat incident on June 26, 2020. (Doc. No. 175 at 17 (quoting Doc. No. 163-1 at 10 (citing Doc. No. 163-2 at 120–24)).) However, Carolina was not in the room at the time of the M.H. Mat incident. (Doc. No. 190 at 307.) In a July 7 email, the Hipschmans informed Samuels that M.H. explained to Carolina in June that C.H. rolled off the mat during the M.H. Mat incident, but did not explain that M.H. bumped C.H.'s head during the incident until July 3. (Doc. No. 189 at 40–41.) In subsequent deposition testimony, Carolina also expressed uncertainty about whether she told Romero about the M.H. Mat incident. Specifically, when asked "did you tell any of those people that [C.H.] had hit his head earlier in the day on June 24th when [M.H.] had been trying to move him?" Carolina responded, "I believe so, yes" and that "I'm remembering that I may have brought that up." (Doc. No. 191 at 20–21.)

M.H. also testified that he told Romero about the M.H. Mat incident while being interviewed in Alexander's presence. (Doc. No. 190 at 292, 296–97.) However, Alexander stated in a July 7 email that he did not know C.H. hit his head during the incident until July 5. (Doc. No. 189 at 30.)

Regardless, the parties affirmatively agree for summary judgment purposes that the Hipschmans told Romero about the Emma, Carolina Mat, and Crib incidents. (Doc. Nos. 163-1 at 10 & n.4; 164-1 at 6; 175 at 17.)

---

[16]   Because the Court concludes that Defendants did not engage in judicial deception, the Court declines to address the issue of which specific Individual Defendant(s) may have been responsible for the alleged deception. (*See* Doc. Nos. 164-1 at 15; 175 at 34–35.)

22-cv-00903-AJB-BLM

The Hipschmans have failed to demonstrate all three elements required to survive the summary judgment motion on the judicial deception claim.

First, with the benefit of hindsight and additional medical opinions, the Court agrees that Defendants' statements to the effect "that Alexander and Carolina failed to provide a plausible explanation for C.H.'s injury," (*see, e.g.*, Doc. No. 175 at 19), were inaccurate. In particular, the Court recognizes that the Carolina Mat incident constituted a plausible explanation for C.H.'s injury. (Doc. No. 190 at 166, 187–88, 214–15, 225, 240.) However, it bears emphasis that Dr. Ayson and Dr. Vega did not reach this conclusion until July 9— after Samuels prepared and submitted the July 1 detention report. (Doc. No. 189 at 100 ("The parents have provided additional history which includes an event where [C.H.] fell from sitting position [*sic*] and hit the left side of his head onto a wooden floor.").) It appears that Dr. Vega's and Dr. Suresh's opinions that the Emma and Crib incidents were not plausible explanations for C.H.'s injury remain unchanged. (Doc. Nos. 189 at 13 (Emma), 20 (Crib), 104 (Crib); 190-1 ¶ 6 (Emma).)

Second, however, the Hipschmans have failed to demonstrate that Defendants made any inaccurate statements deliberately or with a reckless disregard for the truth. At the outset, the Court notes that Defendants are not medical professionals or experts, and so Defendants could not determine whether any specific incident provided a plausible explanation for C.H.'s injury. In turn, Defendants had to rely on any evaluation of the explanations that they could gather from medical professionals. *See Rogers*, 487 F.3d at 1295 n.4 ("the doctor's response is relevant to the question of how serious the children's conditions would have appeared to the reasonable social worker."). Here, Dr. Vega informed Defendants that the Hipschmans did not provide "a plausible explanation" for C.H.'s "severe injury." (Doc. No. 189 at 187.)

And Defendants did not accept Dr. Vega's statement uncritically. After learning about the Emma, Carolina Mat, and Crib incidents, Defendants investigated whether any of the incidents could have provided a plausible explanation for C.H.'s injury. The

22-cv-00903-AJB-BLM

investigation, as it stood on July 1, indicated that the incidents were not plausible explanations for C.H.'s injury.

On the Emma incident, Romero noted on June 27 that Dr. Suresh "indicated that that [*sic*] the child's injury could not have been generated by the head force of him hitting the grandmother's mouth." (*Id.* at 13.)[17]

On the Carolina Mat incident, Samuels learned from Dr. Vega on June 29 that "generally a child does not suffer any injury from a short fall of 2-3 feet high. Never the less [*sic*], an injury can occur if the child fell from a height of 2-3 feet or greater." (Doc. No. 189 at 20.) However, the Hipschmans did not identify any instance where C.H. fell from a height of "2-3 feet or greater." The closest event that the Hipschmans relayed was the Carolina Mat incident, where C.H. fell from a sitting position. (*See* Doc. No. 190 at 405.) Thus, Defendants could have reasonably rejected the Carolina Mat incident as constituting a "short fall." Moreover, the evidence before Defendants indicated that the Carolina Mat incident did not qualify as a short fall. Around July 1, 2020, C.H. was 2'2.97" tall. (Doc. No. 189 at 99.) A fall from a sitting position would therefore likely have meant that C.H.'s head was at a height of less than two feet. (*See id.*) Defendants accordingly could have reasonably rejected the Carolina Mat incident as a plausible explanation for C.H.'s injury before receiving any contrary information from Dr. Ayson and Dr. Vega.[18]

Regarding the Crib incident, on June 29, "Dr. Vega also denied that the child could have suffered a skull fracture form [*sic*] hitting his head on his crib." (Doc. No. 189 at 20.)

The detention report also included Alexander's email to Romero about Dr. Plonsker's comments as well as information about Samuels' attempt to corroborate Dr. Plonsker's purported comments. (*Id.* at 136, 143.) Contrary to the Hipschmans' assertion

---

[17] Dr. Suresh reiterated this conclusion to Samuels on July 11 (*id.* at 46), and in her May 1, 2024 declaration (Doc. No. 190-1 ¶ 6).

[18] If the Hipschmans had reported the M.H. Mat incident to Romero and/or Samuels by July 1, 2020, Defendants could have reasonably rejected the M.H. Mat incident as a plausible explanation for the same reason. In particular, M.H. testified that in that instance, C.H. hit his head from a height that was "[w]ay less than an inch" off the ground while being scooted. (Doc. No. 190 at 306–09.)

that "Samuels did not even ask Dr. Vega about Dr. Plonsker's exculpatory statements" (Doc. No. 175 at 34 (citing Doc. No. 191 at 91)), the evidence shows Samuels did. (Doc. No. 189 at 20–21; 136.) Rather, Samuels simply did not "ask Dr. Vega whether or not [Dr. Plonsker's purported statements were] true." (Doc. No. 191 at 91.)[19]

The fact that medical professionals subsequently determined that the Carolina Mat incident constituted a plausible explanation for C.H.'s injury does not mean that Defendants made any inaccurate statements deliberately or with a reckless disregard for the truth when they relied on the medical professionals' initial statements. Defendants are social workers, not fortune tellers; the Court cannot require Defendants to predict the future.

Third, the Court cannot say that Defendants' statements were material to the juvenile court's decision. Defendants presented the Emma and Crib incidents for the juvenile court's consideration. Defendants noted the Emma incident on page 4 of the detention report and Dr. Suresh's dismissal of the incident as a cause for C.H.'s injury on the following page. (Doc. No. 189 at 129–30; *see also id.* at 136–38, 140.) The detention report addressed the Crib incident on page 4, and Dr. Vega's dismissal of the incident as a cause for C.H.'s injury two pages later. (*Id.* at 129, 131; *see also id.* at 136.)

Although the detention report does not mention the Carolina Mat incident, it included Dr. Vega's explanation that "an injury can occur if the child fell from a height of 2-3 feet or greater." (*Id.* at 131; *see also id.* at 135.)[20]

---

[19]   The Hipschmans did not provide the Court with Samuels' explanation for why she did not ask Dr. Vega if the purported statements were true. (*See id.* at 91–92.)

[20]   The Hipschmans contend that Defendants should have provided more information and that Defendants "suppressed" Dr. Vega's agreement "that a fall from a sitting position was a plausible explanation for C.H.'s injury." (Doc. No. 175 at 33 (citing Doc. No. 190 at 214–15).) This contention is devoid of logic. Dr. Ayson and Dr. Vega did not conclude that C.H.'s injury could have been caused by a fall from a sitting position until July 9. (Doc. No. 189 at 97–101.) It would have been impossible for Defendants to "suppress" a July 9 conclusion in a detention report produced eight days before the fact.

Under these circumstances, Defendants provided all relevant context available at the time to the juvenile court for its determination. *Cf. Scanlon*, 92 F.4th at 799. In turn, it is unlikely that the juvenile court would have reached a different decision even if Defendants did not indicate that the Hipschmans failed to provide a plausible explanation for C.H.'s injury. Moreover, even if Defendants had excluded any such statements from themselves, the juvenile court could still have reached the same result by relying on Dr. Vega's consultation note, which explicitly stated that "[i]n the absence of a plausible explanation, this injury is highly concerning for non-accidental trauma." (Doc. No. 189 at 147.)

Given that the evidence before the Court does not show that Defendants made any misrepresentations "deliberately or with a reckless disregard for the truth" or that the misrepresentations were "material to the [juvenile court's] decision," Defendants are entitled to summary judgment on Claim 3. *Chism*, 661 F.3d at 386; *Scanlon*, 92 F.4th at 799.

### 4. Claim 4 – *Monell* liability

Municipalities may be held liable for constitutional violations caused by "official municipal policy of some nature." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978). As relevant here, an official municipal policy may take the form of "official policies or established customs" as well as "acts of 'omission,' when such omissions amount to . . . official policy." *Clouthier v. County of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010), *overruled on other grounds by Castro v. County of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).

Municipal, or *Monell*, liability claims are "contingent on a violation of constitutional rights." *Lockett v. County of Los Angeles*, 977 F.3d 737, 741 (9th Cir. 2020) (quoting *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994)). Additionally, where a plaintiff asserts that a municipality has "fail[ed] to adequately train its employees, the government's omission must amount to 'deliberate indifference' to a constitutional right." *Clouthier*, 591 F.3d at 1249. Such "deliberate indifference" may be established by showing "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of

constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

To establish liability for the County under *Monell*, the Hipschmans must prove "(1) that [they] possessed a constitutional right of which [they were] deprived; (2) that the municipality had a policy; (3) that this policy 'amount[ed] to deliberate indifference' to the [Hipschmans'] constitutional right; and (4) that the policy [was] the moving force behind the constitutional violation." *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).

The Hipschmans assert that the County is liable under *Monell* for each of the alleged violations in Claims 1, 2, and 3. (Doc. No. 72 ¶¶ 241–308.) In addition to the three incidents addressed in Claim 2 above, the Hipschmans assert that the County is liable for an intake examination of C.H. conducted at Polinsky without notifying the Hipschmans of the intake exam or allowing the Hipschmans to consent to and be present at the exam. (Doc. No. 175 at 43.) Carolina and Alexander seek summary judgment in their favor in terms of the County being liable for the alleged violations Claims 1 and 2. (Doc. No. 167 at 2.) Meanwhile, Defendants seek summary judgment against the Hipschmans in terms of the County being liable for the alleged violations in Claims 1, 2, and 3. (Doc. No. 163-1 at 22–31.)

### a. Count 1 – Unlawful removal

Beginning with *Monell* liability for Claim 1, neither side is entitled to summary judgment.

The Hipschmans assert that a County policy must have been the moving force behind C.H.'s removal because (a) the removal was done "in accordance with the County's policies," (b) Romero was not disciplined for the removal of C.H., and (c) a manager agreed to the removal of C.H. (Doc. No. 167-1 at 29–30; *see also* Doc. No. 175 at 40–41.) Furthermore, the Hipschmans contend that the removal "mirrors the constitutional violation[]" from *Swartwood*, 84 F. Supp. 3d 1093. (Doc. No. 167-1 at 30; *see also id.* at

19–21.) In their reply brief, the Hipschmans add that a County policy precludes social workers from obtaining removal warrants after hours or on the weekend. (Doc. No. 175 at 41–42.)

In contrast, the County argues that it is entitled to summary judgment because the Hipschmans cannot show that a county custom or policy was the moving force behind Defendants' removal of C.H. (Doc. No. 163-1 at 22–28.)

With regard to the Hipschmans' motion, as previously discussed, a rational jury may conclude that Defendants' warrantless removal of C.H. was justified by exigent circumstances to protect C.H. from serious bodily injury from neglect. (*Supra* at 43–45.) In turn, there is a question of fact regarding whether the Hipschmans were deprived of their right to familial association. *Cf. Dougherty*, 654 F.3d at 900. The Hipschmans consequently are not entitled to summary judgment on this basis. Additionally, the Hipschmans waived any argument pertaining to a county policy against removal warrants by raising the argument for the first time in reply. *Autotel*, 697 F.3d at 852 n.3.

As for the County's motion, the Hipschmans may be able to show that a county custom or policy was the moving force behind the removal of C.H. A trier of fact can find that a constitutional violation was caused by a county policy where the underlying action was taken in accordance with the policy. *Chew v. Gates*, 27 F.3d 1432, 1444–45 (9th Cir. 1994). Here, the County has admitted that "Romero was acting pursuant to [the County's] child removal policies." (Doc. No. 167-3 at 33.)

### b.    Count 2 – Deprivation of notice, consent, presence

The issue of *Monell* liability for Claim 2 presents a thornier thicket.

The Hipschmans contend that the County is subject to *Monell* liability for four examinations involving C.H.: (1) an intake examination at Polinksy; (2) Samuels' examination of scratches near C.H.'s groin; (3) the skeletal survey; and (4) the general examination. The Hipschmans claim that "Samuels was not disciplined for subjecting C.H. to a medical examination and a full body Skeletal Survey (X-Ray)" and that the conduct here mirrors the violation presented in *Pope*, 719 F. Supp. 3d 1076. (Doc. No. 167-1 at 29–

30.) In their reply, the Hipschmans add that the County's consent form "was the moving force behind Plaintiffs' constitutional deprivations," that the County did not discipline its social workers, and that there is a question of material fact on whether C.H. underwent an intake examination at Polinsky. (Doc. No. 175 at 42–43.)

The County asserts, on the other hand, that it is entitled to summary judgment because (a) no intake examination occurred at Polinsky; (b) the County was not on notice that its consent form was deficient until 2024 and *Pope* does not establish a pattern of violations; and (c) no violations occurred during the July 9 examinations because the Hipschmans were notified of the examinations and allowed in close proximity. (Doc. No. 163-1 at 28–30.)

### i.      Alleged Polinsky intake examination

Beginning with the alleged intake examination at Polinsky, there is a genuine issue of material fact on whether such an examination even occurred. The Hipschmans rely on Carolina's statement that Romero told Carolina "that they had just finished an intake exam on [C.H.]" as well as Romero's note that "C.H. was 'in intake' at Polinsky" to argue an intake examination occurred. (Doc. No. 175 at 43 (citing Doc. Nos. 189 at 12; 191 at 12).) Defendants present evidence that a county employee searched Polinsky's records and did not find any files for C.H., "which means that no [Polinsky Children's Center] medical examination was conducted." (Doc. No. 163-5 ¶ 2.) Given this conflicting evidence, the Court must allow a jury to decide first whether an intake examination occurred. *Soremekun*, 509 F.3d at 984.

If the examination occurred, however, a trier of fact could conclude that a county policy was the moving force behind any violations that flowed from the examination. Indeed, it is difficult to conceive of how a county policy was not the moving force behind the examination—and any attendant constitutional violations—given that the County produced and asked parents to sign a consent form to authorize at least such an intake examination. (*See, e.g.*, Doc. No. 189 at 64.) *See also Chew*, 27 F.3d at 1444–45.

Defendants' insistence that the County was not on notice of any deficiencies in its consent form does not change the Court's conclusion. Defendants focus in particular on whether the Hipschmans' reliance on *Pope* is sufficient "to establish a *pattern* of violations under *Monell*." (Doc. No. 163-1 at 29.) But as the Court just noted, the existence of the consent form is sufficient to establish that a county policy existed and that the policy was a moving force behind the examination. It is plausible that Defendants raise their lack of notice of the form's deficiencies as a way to show that the County was not deliberately indifferent to the Hipschmans' constitutional rights. *See Dougherty*, 654 F.3d at 900 ("In order to establish liability for governmental entities under *Monell*, a plaintiff must prove . . . that th[e] policy amounts to deliberate indifference to the plaintiff's constitutional right"). However, Defendants do not articulate any such defense. (Doc. Nos. 163-1 at 28–30; 172 at 19–20; 186 at 7–8.) Regardless, as the Hipschmans note, "[w]hether a local government entity has displayed a policy of deliberate indifference is generally a question for the jury." *Oviatt by and through Waugh v. Pearce*, 954 F.2d 1470, 1478 (9th Cir. 1992). (Doc. No. 175 at 40.)

### ii.    Samuels' examination of scratches near C.H.'s groin

Turning next to the examination of the scratches, neither the Hipschmans and nor Defendants has briefed whether the County should face *Monell* liability for Samuels' examination of the scratches near C.H.'s groin. (*See* Doc. Nos. 163-1 at 28–30; 167-1 at 29–30; 172 at 19–20; 175 at 40–43; 186 at 7–8.) Accordingly, the Court will not assess such an undeveloped issue, and neither side is entitled to summary judgment. *Hibbs*, 273 F.3d at 873.

### iii.    Skeletal survey

Moving on to the skeletal survey, as previously discussed, Defendants provided the Hipschmans with adequate notice of the skeletal survey and Carolina was present for the examination. (*Supra* at 51–53.) Accordingly, there was no constitutional violation on which to base a *Monell* claim for these rights. *Lockett*, 977 F.3d at 741. Defendants are thus

entitled to summary judgment on the issue of *Monell* liability as it pertains to the Hipschmans' rights to notice and to be present for the skeletal survey.

Nevertheless, there remain genuine issues of material fact regarding whether the County should be subject to *Monell* liability for a violation of the Hipschmans' right to consent to the skeletal survey. As previously noted, Defendants concede that parents can revoke their consent, which Carolina did with respect to the skeletal survey. (*Supra* at 53.) C.H. nevertheless underwent a skeletal survey while in Defendants' custody. (*See* Doc. No. 189 at 118.) On the one hand, a jury may conclude that the County's consent form constituted a moving force behind C.H. undergoing the skeletal survey without Carolina's consent. Such a conclusion would be largely consistent with Defendants' assertion that the consent form authorized the skeletal survey. (*See* Doc. No. 164-1 at 22; *see also Chew*, 27 F.3d at 1444–45.) On the other, a jury may conclude that the County's policies were not a moving force behind the examination insofar as the County allows parents to withdraw their consent and C.H. underwent the skeletal survey after such a withdrawal had occurred. (*See* Doc. No. 191 at 150.) In that scenario, a reasonable trier of fact could find that the skeletal survey occurred despite County policy allowing parents to withdraw their consent.

Moreover, even if a jury concludes that the County's consent form was a moving force behind C.H. undergoing the skeletal survey, a jury may still conclude that the existence and use of the consent form indicates that the County was not deliberately indifferent to the Hipschmans' right to consent to the skeletal survey since the County attempted to obtain such consent. *See Oviatt*, 954 F.2d at 1478.

### iv.    General examination

Turning to the general examination, as previously discussed, Defendants provided the Hipschmans with adequate notice of the general examination. (*Supra* at 54.) Accordingly, there was no constitutional violation on which to base a *Monell* claim for the right to notice. *Lockett*, 977 F.3d at 741. Defendants are thus entitled to summary judgment on the issue of *Monell* liability as it pertains to the Hipschmans' right to notice for the general examination.

22-cv-00903-AJB-BLM

However, genuine issues of material fact preclude summary judgment on *Monell* liability as it pertains to the Hipschmans' rights to consent to and to be present for the general examination. Like with the skeletal survey, a jury may conclude that the consent form indicates that the County was not deliberately indifferent to the Hipschmans' right to consent to the skeletal survey. Meanwhile, there is still a material dispute over why Carolina was excluded from the general examination. (*Supra* at 57–59).[21]

### c.    Count 3 – Judicial deception

Moving to the issue of *Monell* liability for Claim 3, the County is entitled to summary judgment in its favor. Individual Defendants did not engage in judicial deception because they did not make any misrepresentations "deliberately or with a reckless disregard for the truth" and any misrepresentations were not "material to the [juvenile court's] decision." (*Supra* at 59–65.) The County cannot be held liable for a constitutional violation that never occurred. *Lockett*, 977 F.3d at 741.

## IV.    CONCLUSION

In light of the foregoing, Court rules on the pending motions and requests as follows.

Defendants' *Daubert* Motion to Exclude Expert Testimony of Plaintiffs' Expert Melinda Muphy, M.A. (Doc. No. 159) is **GRANTED**.

Defendants' *Daubert* Motion to Exclude Expert Testimony of Plaintiffs' Expert Stephen Papaleo, Ph.d. (Doc. No. 160) is **GRANTED IN PART and DENIED IN PART**.

The Hipschmans must provide Defendants with corrected expert reports that comply with this Omnibus Order **WITHIN 30 DAYS**.

Defendants' requests for judicial notice (Doc. Nos. 163-3; 164-3) are **DENIED**.

The Hipschmans' motion for partial summary judgment (Doc. No. 167)

- On Claim 1 is **DENIED**;
- On Claim 2 is

---

[21] The Court notes, again, that there appears to be conflicting evidence on whether Carolina was excluded from the general examination. (*Supra* n.15.)

22-cv-00903-AJB-BLM

- o **GRANTED IN PART** as it pertains to the Hipschmans' right to consent to the skeletal survey, and
- o **DENIED IN PART** as it pertains to the Hipschmans'
  - rights to notice of, to consent to, and to be present for Samuels' examination of scratches near C.H.'s groin;
  - rights to notice of and to be present for the skeletal survey; and
  - rights to notice of, to consent to, and to be present for the general examination; and
- On Claim 4 is **DENIED** as it pertains to the County's liability for
  - o Count 1: the removal of C.H., and
  - o Count 2: the alleged violations of the Hipschmans'
    - rights to notice of, to consent to, and to be present for the alleged intake examination at Polinsky;
    - rights to notice of, to consent to, and to be present for Samuels' examination of scratches near C.H.'s groin;
    - rights to notice of, to consent to, and to be present for the skeletal survey; and
    - rights to notice of, to consent to, and to be present for the general examination.

The Individual Defendants' motion for summary judgment (Doc. No. 164)

- On Claim 1 is **GRANTED**;
- On Claim 2 is
  - o **GRANTED IN PART** as it pertains to the Hipschmans'
    - rights to notice of and to be present for the skeletal survey; and
    - right to notice of the general examination; and
  - o **DENIED IN PART** as it pertains to the Hipschmans'
    - rights to notice of, to consent to, and to be present for Samuels' examination of the scratches near C.H.'s groin;
    - right to consent to the skeletal survey; and
    - rights to consent to and to be present for the general examination; and
- On Claim 3 is **GRANTED**.

The County's motion for summary judgment (Doc. No. 163)

- On Claim 4 is
  - o **GRANTED IN PART** as it pertains to the County's liability for
    - Count 2: the alleged violations of the Hipschmans'
      - rights to notice of and to be present for the skeletal survey; and

22-cv-00903-AJB-BLM

- right to notice of the general examination; and
  - Count 3: Individual Defendants' alleged acts of judicial deception; and
- o **DENIED IN PART** as it pertains to the County's liability for
  - Count 1: the removal of C.H., and
  - Count 2: the alleged violations of the Hipschmans'
    - rights to notice of, to consent to, and to be present for the alleged intake examination at Polinsky;
    - rights to notice of, to consent to, and to be present for Samuels' examination of scratches near C.H.'s groin;
    - rights to consent to the skeletal survey; and
    - rights to consent to and to be present for the general examination.

**IT IS SO ORDERED.**

Dated:  March 6, 2026

Hon. Anthony J. Battaglia
United States District Judge

22-cv-00903-AJB-BLM